**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAMES MELVIN SMITH,

      Defendant-Appellant.

No. 96-6377

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

PAUL EUGENE CHILTON,

      Defendant-Appellant.

No. 96-6378

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MICHAEL JAMES SNIDER,

      Defendant-Appellant.

No. 96-6379

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-96-42-T)

---

Don J. Gutteridge, Jr., Oklahoma City, Oklahoma, for Defendant-Appellant James Melvin Smith in No. 96-6377.

Teresa Brown, Assistant Federal Public Defender (June E. Tyhurst, Assistant Federal Public Defender, with her on the brief), Oklahoma City, Oklahoma, for Defendant-Appellant Paul Eugene Chilton in No. 96-6378.

Donald A. Herring, Oklahoma City, Oklahoma, for Defendant-Appellant Michael James Snider in No. 96-6379.

Kerry Kelly, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, and Frank Michael Ringer, Assistant United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee the United States of America.

---

Before PORFILIO, BRORBY, and KELLY, Circuit Judges.

---

KELLY, Circuit Judge.

---

Defendants-Appellants Michael Snider, Paul Chilton, and James Smith were tried jointly and convicted of various offenses arising from an unlawful methamphetamine operation. Messrs. Snider and Chilton were convicted of conspiring to manufacture methamphetamine, 21 U.S.C. § 846, causing the manufacture of methamphetamine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and manufacturing methamphetamine, 21 U.S.C. § 841(a)(1). In addition, Mr. Snider was convicted of possession with intent to distribute methamphetamine, 21 U.S.C.

- 2 -

§ 841(a)(1), and of being a felon in possession of a firearm which had travelled in interstate commerce, 18 U.S.C. § 922(g)(1). Mr. Chilton was also convicted of distribution of methamphetamine, 21 U.S.C. § 841(a)(1). Mr. Smith was convicted only of distribution of methamphetamine, 21 U.S.C. § 841(a)(1). Mr. Snider was sentenced to 360 months in prison; Mr. Chilton was sentenced to 297 months in prison; and Mr. Smith was sentenced to 262 months in prison, each with a five-year supervised release.

Each defendant appeals his conviction or sentence or both. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1), and we affirm.

Background

In January, 1996, a California narcotics detective contacted the Oklahoma City Police Department to pass on information that Michael Snider, under the alias Monty Snider, was running a methamphetamine operation in Oklahoma City. The California informant who had provided the information spoke directly to an Oklahoma officer. He told the officer that Mr. Snider was living in the home of Mr. Chilton, who was assisting him, and he gave a detailed description of Mr. Chilton's house and its surroundings, as well as directions to it. Because of a separate undercover operation, however, the California officers refused to allow

Oklahoma City police to use the informant's knowledge to apply for a search warrant.

A felony arrest warrant and two misdemeanor warrants for Mr. Snider were outstanding in California. The Oklahoma officer verified the validity of the warrants and obtained a photograph of Mr. Snider. He spoke with Mr. Snider's probation officer in California to verify that Mr. Snider was in violation of his probation, which was the basis for the felony warrant. With another officer he drove past Mr. Chilton's house several times in an effort to see Mr. Snider. On the north side of the house was a detached two-car garage; a stockade fence ran between the house and garage. During a drive-by on February 26, 1996, the officers saw Mr. Snider standing at the open door of the detached garage. Because of the layout of the house and garage, and because they did not know how many people were present in each building, the officers called federal marshals to assist in executing the California felony arrest warrant. One of the deputy marshals independently verified the warrant's validity.

As the officers approached the house to serve the warrant, they split into two groups to cover both the house and garage. An Oklahoma officer led one group to the garage to locate Snider and to conduct a protective sweep. He began to circle the garage. On the south side he saw a door with six to eight glass panes painted black. One of the panes was missing and the area was covered with

cardboard. The officer pushed aside the cardboard, announced his presence, and asked if anyone was there. He looked through the opening and saw no one, but did see glassware, chemical containers, tubing, and other equipment which he believed to be an illegal methamphetamine laboratory. The officer did not enter, but continued around the garage. His entire sweep lasted approximately thirty to forty seconds.

Meanwhile, the other group went to the house and announced themselves. Snider admitted them; he was arrested and brought outside. A number of other individuals were detained during the arrest, among them co-defendants James Smith and Paul Chilton. The officer who conducted the protective sweep obtained a search warrant based on what he saw in the garage. Execution of the warrant later that day revealed a full-scale laboratory for manufacturing methamphetamine, along with precursor chemicals. All of the equipment contained methamphetamine or methamphetamine residue. A semi-automatic weapon was found in the garage near the lab equipment. A rifle and loaded shotgun were in the living room. Several semi-automatic weapons, ammunition, and drug paraphernalia were found elsewhere in the house.

All three defendants moved to suppress the results of the search on the ground that when the officer pushed aside the cardboard and looked into the laboratory he conducted an illegal and warrantless search, tainting the warrant

based on it. The district court denied the motion, finding that the officer's action was justified as a legitimate protective sweep for the officers' safety, and as an effort to locate Mr. Snider.

On appeal Mr. Snider and Mr. Chilton challenge that ruling. In addition, Mr. Chilton challenges the sufficiency of the evidence for his convictions, as well as a four-level upward adjustment he received at sentencing for his role as a leader. Mr. Smith raises two sentencing challenges: whether the district court properly refused to decrease his offense level based on his claim of minor participation, and whether the court properly applied a two-level enhancement for possession of a dangerous weapon. We address each defendant's contentions separately.

### Discussion

#### I. Michael Snider

Mr. Snider's sole challenge on appeal is to the denial of the motion to suppress evidence from the search of the house and garage where he and Mr. Chilton lived. In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government. See United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir. 1995) (en banc), cert. denied, 116 S. Ct. 2529 (1996). We accept the district court's factual findings unless they are

clearly erroneous; however the ultimate determination of Fourth Amendment reasonableness is a question of law which we review de novo.  See id.

A protective sweep is a brief search of premises during an arrest to ensure the safety of those on the scene.  The Fourth Amendment allows a protective sweep if police have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others."  Maryland v. Buie, 494 U.S. 325, 327 (1990) (internal quotations and citations omitted).  The limited intrusion is justified by the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack."  Id. at 333.  The search must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," id. at 327, and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises," id. at 335-36.

The officer's protective sweep of the garage complied with these standards.  The specific and articulable facts the officer possessed, after speaking with the California police, their informant, and Mr. Snider's probation officer, included

(1) that Mr. Snider was operating a methamphetamine operation at the premises, (2) that others were living at the premises and assisting him, (3) that he had violated probation and was wanted on three arrest warrants, and (4) that he had been seen at the garage a short time before. The officer could rationally infer from these facts that Mr. Snider had accomplices in either the house or garage, and that they might use firearms to protect their drug business. The sweep was properly limited in scope, because the officer did not enter the garage when it appeared no one was in it. And its duration was between thirty and forty seconds, well within the time it took to arrest Mr. Snider and depart.

The officer's actions were also justified as an attempt to locate Mr. Snider, who had been seen standing at the door of the garage approximately fifteen minutes earlier. At the time the officer began his sweep Mr. Snider had not yet been located; the officer was not aware Mr. Snider had been found and arrested until he had completed his sweep. Police officers serving an arrest warrant may enter the premises of the person to be arrested. See Payton v. New York, 445 U.S. 573, 602-03 (1980); United States v. Morehead, 959 F.2d 1489, 1496 (10th Cir.) (holding that officers executing arrest warrant properly walked around to back of house and looked through windows, when they had reason to believe the suspect was on the premises), reheard in part and aff'd sub nom. United States v. Hill, 971 F.2d 1461 (10th Cir. 1992) (en banc).

Mr. Snider attempts to raise two issues for the first time on appeal. First, he argues that the protective sweep was pretextual. Because the officers were denied use of the California informant's knowledge to obtain a search warrant, Mr. Snider contends they used the arrest warrant as an excuse to go onto the premises to obtain probable cause for a search warrant.

The issue of pretext is a fact-intensive inquiry, involving weighing evidence and the credibility of testimony, and we would review the resultant factual findings for clear error. See United States v. Maestas, 2 F.3d 1485, 1490 (10th Cir. 1993); United States v. Dewitt, 946 F.2d 1497, 1502 (10th Cir. 1991). We have no findings of fact to review, however. Although Mr. Snider moved for suppression prior to trial, he did not present this basis for suppression at any stage of his motion, and the court did not rule on it. Fed. R. Cr. P. 12(b)(3) requires that motions to suppress be made prior to trial, and Rule 12(f) provides that failure to make the motion prior to trial operates as a waiver. The waiver provision of Rule 12(f) applies not only to the failure to move for suppression, but also to the failure to include a specific argument in the motion. See Dewitt, 946 F.2d at 1502. Mr. Snider has waived the issue of pretext.

Rule 12(f) provides that the court may grant relief from this waiver "for cause shown," Fed. R. Cr. P. 12(f), but Mr. Snider has made no attempt to show

cause for his failure to raise the issue below, and we discern nothing that prevented him from raising it.

We ordinarily review forfeited error, when raised on appeal, for plain error resulting in manifest injustice. See Fed. R. Cr. P. 52(b); Dewitt, 946 F.2d at 1502. In this circumstance, however, we have nothing to review, because there was no factual development of the issue of pretext in the district court. Once a warrantless search has been justified by the government, the defendant bears the burden of proving that the government's justification is pretextual. See Maestas, 2 F.3d at 1491-92. Mr. Snider has not pointed to any evidence that satisfies this burden, and our own independent review of the record reveals no evidentiary basis for a pretext. Without a factual basis there is nothing upon which to predicate a finding of pretext either in the district court or on our plain error review of the district court's rulings.

By adopting the arguments of co-defendant Chilton, Mr. Snider also attempts to raise for the first time on appeal whether the California arrest warrant was valid in Oklahoma. Both defendants argue it was not, and that the results of the search are tainted by its use and should be suppressed. For the same reasons discussed above, the defendants have waived this issue by not raising it prior to trial. See Fed R. Cr. P. 12(b)(3), (f); Dewitt, 946 F.2d at 1502. Neither defendant has shown cause why we should grant relief from that waiver, and we

see no reason to do so. Instead they suggest it was plain error for the court to deny their motion to suppress. See Fed. R. Cr. P. 52(b).

We may correct an error not raised at trial under Rule 52(b) if there is (1) error (2) that is plain and (3) that affects substantial rights. See Johnson v. United States, 117 S. Ct. 1544, 1548-49 (1997); United States v. Olano, 507 U.S. 725, 732 (1993). If these three elements are present we may exercise our discretion to notice forfeited error, "but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Johnson, 117 S. Ct. at 1549 (quotation marks omitted; alteration in original).

We find no error. The purpose of the warrant requirement is not jurisdictional, but is to interpose a neutral magistrate's determination of probable cause between the zealous officer and the citizen. See Payton, 445 U.S. at 602. Where state officers are arresting a person within their state, neither precedent nor logic requires a second arrest warrant to be obtained when a valid warrant has been issued in another state. See United States v. Johnson, 815 F.2d 309, 313-14 (5th Cir. 1987) (holding that federal officers were authorized under Texas law to arrest the defendant in Texas on an outstanding California warrant); Ierardi v. Gunter, 528 F.2d 929, 931 (1st Cir. 1976) (stating that nothing prevents another state from making the requisite determination of probable cause); Bandy v. Willingham, 398 F.2d 333, 335 (10th Cir. 1968).

## II. Paul Chilton

Mr. Chilton raises three issues: (1) whether the district court erred in denying the defendants' joint motion to suppress, (2) whether the district court correctly applied a four-level upward adjustment for his role as a leader, and (3) whether the evidence was sufficient to support his convictions. Mr. Chilton makes the same arguments Mr. Snider made regarding the denial of the motion to suppress, and we reject them for the same reasons, noting in addition that we question Mr. Chilton's standing to contest Mr. Snider's arrest. See Alderman v. United States, 394 U.S. 165, 174 (1969) (stating the general rule that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted").

Mr. Chilton also challenges the application of a four-level upward adjustment under USSG § 3B1.1(a) for his role as a leader in a criminal organization involving five or more participants. See USSG § 3B1.1(a). To apply an enhancement under § 3B1.1 the court must find by a preponderance of the evidence (1) that Mr. Chilton was an organizer or leader (2) of criminal activity that involves five or more participants or is otherwise extensive. See United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995). The district court may consider all relevant conduct under § 1B1.3(a)(1)-(4), not merely the conduct involved in the counts of conviction. See USSG ch.3, pt.B, intro. comment.

Factors to be considered in determining whether a defendant was an organizer or leader "include the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, comment. (n.4). "[T]he gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals . . . ." Torres, 53 F.3d at 1142. We review the sentencing court's findings of fact for clear error, giving due deference to the district court's application of the guidelines to the facts. See United States v. Farnsworth, 92 F.3d 1001, 1009 (10th Cir.) (citing United States v. Gomez-Arrellano, 5 F.3d 464, 465 (10th Cir. 1993)), cert. denied, 117 S. Ct. 596 (1996).

The district court found that ten named individuals, among others, were involved in the conspiracy, and Mr. Chilton does not dispute this finding. He does, however, challenge the court's finding that he controlled the activity of James Smith, Rhonda Hoosier, Morton Hayner, Colleen Carothers, and Cindy Lou Shaw. Mr. Chilton argues there is no evidence to support the court's specific finding that he recruited the latter four to resell methamphetamine, or that he directed them to buy ingredients for the manufacture of methamphetamine.

Ample evidence supports the findings that Mr. Chilton recruited accomplices, directed them to go out and sell methamphetamine, and directed them to purchase necessary chemicals with money he gave them. See VII R. 448-49. In addition, Mr. Chilton exercised significant control over the operation. Only he and Mr. Snider had keys to the methamphetamine lab. See V R. 182-83. Mr. Chilton became Mr. Snider's equal partner in the operation, see VII R. 447-48, with responsibility for directing the manufacture of their product, see VII R. 402. He was a leader of the organization along with Mr. Snider, see VII R. 404, and exercised decision-making authority in the conspiracy, see VII R. 448. Mr. Chilton taught others to cook methamphetamine. See VI R. 254-55. In fact, his methamphetamine was reputed to be better than Mr. Snider's. See VII R. 402, 415-16, 447.

Finally, Mr. Chilton challenges the sufficiency of the evidence to support his convictions for conspiracy to manufacture methamphetamine, and for manufacture, distribution, and possession of methamphetamine. Mr. Chilton was neither charged with nor convicted of possession of methamphetamine, except inasmuch as it is a lesser included offense of distribution. See I R. doc. 3/20/96 (Indictment); I R. doc. 153 (Judgment). The government's argument that the evidence is sufficient to convict him of possession is likewise misdirected. We

will construe Mr. Chilton's argument to challenge the sufficiency of the evidence for each of his convictions.

We view the evidence and all inferences from it in the light most favorable to the government to determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. See United States v. Starnes, 109 F.3d 648, 649 (10th Cir.) (White, J.), cert. denied, 117 S. Ct. 2529 (1997). In order for us to conclude the evidence was insufficient to support a conviction, "we must find that no reasonable juror could have reached the disputed verdict." United States v. Hoenscheidt, 7 F.3d 1528, 1530 (10th Cir. 1993).

Mr. Chilton concedes that the methamphetamine operation existed at his house, but contests the evidence linking him to it. See Aplt. Brief at 28. He asserts that no physical evidence connects him to the crimes charged, and that "[t]he only evidence of his participation came from the unreliable testimony of the government's witnesses who were cooperating criminals." Id.

A jury in a criminal case may convict a defendant solely on the basis of the uncorroborated testimony of an accomplice. See United States v. Ivy, 83 F.3d 1266, 1284 (10th Cir.), cert. denied, 117 S. Ct. 253 (1996). Furthermore, the credibility of witnesses is a matter for the jury, and on appeal we must resolve credibility issues in the jury's favor unless the testimony is "inherently

incredible." Tapia v. Tansy, 926 F.2d 1554, 1562 (10th Cir. 1991). Mr. Chilton has not argued that any testimony is inherently incredible, and our independent review of all the evidence satisfies us that the testimony was well within the range which a rational jury could believe. This being so, we must resolve credibility choices in favor of the jury's verdict. See Jackson v. Virginia, 443 U.S. 307, 326 (1979); United States v. Morales, 108 F.3d 1213, 1222 (10th Cir. 1997); Tapia, 926 F.2d at 1562 ("[W]e do not sit as a new trier of fact. We presume that the jury's findings in evaluating the credibility of each witness are correct."). Because we are not free to weigh the credibility of witnesses whose testimony is not inherently incredible, Mr. Chilton's challenge fails as a matter of law, and we need not analyze the elements of each conviction or point out the overwhelming evidence in the record supporting them.

### III.    James Smith

Mr. Smith argues, first, that the district court erred in rejecting his request for a two-level reduction of his offense level under USSG § 3B1.2(b) because he was a minor participant. The sentencing court's determination that Mr. Smith was not a minor participant is a finding of fact which we review for clear error, giving due deference to the district court's application of the guidelines to the facts. See

United States v. Williamson, 53 F.3d 1500, 1523 (10th Cir. 1995); Farnsworth, 92 F.3d at 1009.

A defendant must prove his entitlement to an offense-level reduction by a preponderance of the evidence. See Williamson, 53 F.3d at 1523. A two-level decrease under § 3B1.2(b) is appropriate when a defendant "was a minor participant in any criminal activity." USSG § 3B1.2(b). A minor participant is one who is "less culpable than most other participants," USSG § 3B1.2 comment., n.3; and this lesser culpability relative to others involved in the offense is the gravamen of the reduction under § 3B1.2. See United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994).

In rejecting Mr. Smith's claim of minor participation, the district court found that he had travelled from California to Oklahoma for the purpose of learning to manufacture methamphetamine, and that he and Marcy Thompson lived rent-free with Messrs. Chilton and Snider and others while Mr. Smith bought ingredients for and cooked methamphetamine. The court also found that he directed Marcy Thomson to do small tasks in the drug lab.

Mr. Smith contends there is absolutely no evidence to support the finding that he moved from California to Oklahoma to learn to cook methamphetamine. There is. Marcy Thompson testified that Mr. Chilton's wife, Teresa, asked her if she knew that the reason Mr. Smith had come was to learn to make dope. See III

R. 230. Ms. Thompson further testified that she went with Mr. Smith on two occasion to buy ingredients for methamphetamine. See III R. 224-25. Mr. Smith directed her to do small tasks in the methamphetamine lab, which she did. See III R. 227-28. He told her he made dope, see III R. 229, and on one occasion showed her a baggie of methamphetamine that he had cooked, see III R. 230-31. It was not clear error for the district court to find that Mr. Smith, as compared to Ms. Thompson and the many other participants in the methamphetamine scheme, was not a minor participant.

Mr. Smith argues, finally, that the district court improperly applied a two-level enhancement under USSG § 2D1.1(b)(1), which provides: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." None of the guns found at the residence was registered to Mr. Smith, and his fingerprints were not found on any of them. The district court applied the enhancement based on the loaded weapons found in the lab where Mr. Smith worked, and in residence where he lived. The court found that the weapons were used to protect the drugs and the methamphetamine lab.

"The [enhancement for weapon possession] should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1, comment., (n.3). The government bears the initial burden of proving possession by a preponderance of the evidence, and possession

may be satisfied by showing mere proximity to the offense. See United States v. Roberts, 980 F.2d 645, 647 (10th Cir. 1992). The enhancement is then appropriate unless the defendant proves the exception—that it is clearly improbable the weapon was connected with the offense. See id.

The evidence is undisputed that a loaded semiautomatic firearm was found in the garage near the entrance to the drug lab. See III R. 117-18. This proximity to the offense is enough to establish the appropriateness of the enhancement. See United States v. Roederer, 11 F.3d 973, 982-83 (10th Cir. 1993); Roberts, 980 F.2d at 647. Mr. Smith has not made a showing that it was clearly improbable the weapon was connected with his offense. Instead he argues that he did not "possess" any of the weapons because none was found in his bedroom and they all belonged either to Mr. Chilton or Mr. Snider. Personal possession of a firearm, however, is not necessary. See United States v. Underwood, 982 F.2d 426, 428-29 (10th Cir. 1992). The sentencing court may "attribute to a defendant weapons possessed by his codefendants if the possession of weapons was known to the defendant or reasonably foreseeable by him." United States v. McFarlane, 933 F.2d 898, 899 (10th Cir. 1991). The district court's findings in this regard are not clearly erroneous, and its application of the enhancement was proper.

AFFIRMED.