**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DOMINIC G. PEARSON,

      Defendant-Appellant.

No. 97-3271

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 97-10026-01-MLB)

---

Roger L. Falk of the Law Office of Roger L. Falk, P.A., Wichita, Kansas, for
Defendant-Appellant.

Lanny D. Welch, Assistant United States Attorney (Jackie N. Williams, United
States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

---

Before **EBEL**, **HENRY**, and **BRISCO**E, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

     A jury convicted Dominic Pearson of one count of conspiracy to obstruct

commerce by robbery and one count of obstruction of commerce by robbery, both

in violation of 18 U.S.C. § 1951 (the Hobbes Act), and one count of carrying or using a firearm during and in relation to a crime of violence resulting in the murder of a person through use of a firearm, a violation of 18 U.S.C. § 924(c)(1) and (j)(1). The court sentenced Mr. Pearson to concurrent sentences of 240 months for each of the § 1951 violations and 360 months for the § 924 violation.

Mr. Pearson appeals his convictions on the grounds that (1) Congress did not have the constitutional authority to enact § 1951, (2) the district court erroneously refused to allow Mr. Pearson to submit a tardy alibi defense, (3) the evidence was insufficient to support his conviction on any count, (4) the district court erroneously instructed the jury on the elements of felony murder, and (5) the district court erroneously refused to submit Mr. Pearson's requested lesser included offense instructions to the jury. We affirm.

## I.  BACKGROUND

Two men, one wielding a handgun, robbed Mr. Goodcents Subs & Pastas in Wichita, Kansas, around 9:55 p.m. on Monday, February 17, 1997. As the men were emptying the cash register and safe, the handgun accidentally discharged, and the bullet from the gun hit and killed Amie Montgomery, the nineteen-year-old shift supervisor who was on duty. The robbers fled with roughly $2,500.

Dominic Pearson and several others were arrested and charged in relation

2

to the events at Mr. Goodcents. Some of those charged pleaded guilty and agreed to testify at Dominic's trial. Among those testifying was Deborah Meyer, an assistant manager at Mr. Goodcents, who stated that her boyfriend, Eric Pearson, had discussed with her various plans to rob the store. She testified that she also met with Eric and his cousin Dominic and talked about where the store kept its money and when would be the best time to rob the store. She stated that before the date of the robbery, the Pearsons left her house intending to rob the store but later told her they could not complete the crime because there were police around the restaurant. However, according to Ms. Meyer, Eric Pearson continued to plan to take money from Mr. Goodcents until February 17.

Another accomplice, Courtney Martin, testified that he had robbed the restaurant with Dominic while Eric waited in the car. Mr. Martin averred that Dominic picked him up at Mr. Martin's girlfriend's house at around 8:30 p.m. on the night of the robbery. He stated that they drove around, smoking marijuana, prior to going to Eric's, where Eric and Dominic went into another room and talked before emerging to discuss the robbery with him. Mr. Martin claimed that Eric assured him that the robbery would go well because Ms. Meyer had given him detailed information about how to commit the crime. He stated that Eric then gave him clothing to wear, drove him and Dominic to Mr. Goodcents, waited in the car, and drove them away after the crime. Mr. Martin admitted that Dominic

handed him the gun to use in the robbery and that he was holding the gun when it fired, killing Ms. Montgomery. He also said that the three of them split the robbery proceeds later that evening at Eric's house.

The government presented witnesses not involved in the crime, including Angela Starks, who was working with Ms. Montgomery at the time of the robbery, and Steve Peterson, the owner of Mr. Goodcents. Ms. Starks testified to the details of the robbery and then identified Dominic as the unarmed robber. However, as she acknowledged on cross-examination, Ms. Starks had been unable to pick Dominic out of a photo array soon after the robbery and had seen his picture on television in connection with the robbery before her in-court identification. Additionally, Dominic was the only black male in the courtroom who was of the right age to be a suspect in the crime. In contrast, Ms. Starks had picked Mr. Martin out of a photo array as the armed robber. Mr. Peterson testified that Mr. Goodcents is part of a national chain and purchases goods from both Kansas and out-of-state companies for sale to customers. According to Mr. Peterson, business suffered after the robbery and killing, and the stolen money would have been used to purchase goods produced outside of Kansas.

Dominic testified in his own defense. He swore that he had driven by Mr. Goodcents with Eric several days before the robbery and that Eric was trying to convince him to rob the restaurant; however, he told Eric he would not participate

4

in the robbery. He claimed that he did not help in the robbery on February 17. To rebut Mr. Martin's testimony that he and Dominic were riding around together before going to Eric's house, he testified that he was at a mall jewelry store having his watch repaired at around 9:00 p.m. He introduced into evidence a watch store receipt that an employee of the store testified was a record of payment for watch sizing and battery replacement. The jewelry store employee also stated that he had done the work on the watch, believed the watch had been dropped off just before the store closed at 9:00 p.m. on the seventeenth, and remembered that the watch wasn't picked up until five or ten minutes later, after closing. Although the employee could not identify the person who had brought the watch in and picked it up, he recalled that the person was a black male. Dominic also produced evidence showing that Eric had called Dominic's pager at 9:00 p.m. on the seventeenth.

## II. ANALYSIS

A. <u>Constitutionality of 18 U.S.C. § 1951</u>

Mr. Pearson moved to dismiss the indictment claiming that Congress lacked the constitutional authority to enact § 1951. The district court denied his motion. "We review challenges to the constitutionality of a statute de novo." <u>United States v. Bolton</u>, 68 F.3d 396, 398 (10th Cir. 1995). We have previously

5

concluded that § 1951 "regulates activities which in aggregate have a substantial effect on interstate commerce." Id. at 399. Therefore, § 1951 "represents a permissible exercise of the authority granted to Congress under the Commerce Clause." Id.; see also , United States v. Romero , 122 F.3d 1334, 1340 (10th Cir. 1997), cert. denied , 118 S. Ct. 1310 (1998); United States v. Shinault , No. 97-3061, 1998 WL 378119, at *12 (10th Cir. July 8, 1998). Because § 1951 is within Congress's Commerce Clause authority, Mr. Pearson's constitutional challenge to his convictions fails.

B.      Mr. Pearson's alibi

Pursuant to Fed. R. Crim. P. 12.1(a), the government requested notice of Mr. Pearson's alibi defenses on April 17, 1997. Mr. Pearson's attorney did not respond with notice of an alibi within the ten days required by Rule 12.1(a) and, in fact, told the government on at least two occasions that Mr. Pearson had no alibi defense. However, on June 12, Mr. Pearson's counsel learned that Mr. Pearson's mother wished to testify that Mr. Pearson was at her house between 9:45 and 10:00 p.m. on the night of the robbery and murder. Because the trial was scheduled to begin on June 16, Mr. Pearson's attorney moved for a continuance so that he could develop the alibi defense and for permission to use the alibi defense despite failure to give timely notice to the government. After

6

hearing argument, the court denied both motions.

We review the district court's decision to exclude alibi evidence for abuse of discretion. See United States v. Davis, 40 F.3d 1069, 1076 (10th Cir. 1994). Rule 12.1(a) states that, within ten days of a written demand from the government, the defendant must give notice of his intention to offer an alibi defense. Rule 12.1(b) places a reciprocal witness identification requirement on the government, requiring it to disclose witnesses it intends to use to establish the defendant's presence at the scene of the crime and any other witnesses it will rely on to rebut the testimony of the defendant's alibi witnesses. Rule 12.1(c) places on the parties a continuing duty to disclose according to 12(a) and (b). Rule 12.1(d) allows the court to exclude the testimony of any witness not identified in compliance with Rule 12.1(a) or (b), and Rule 12.1(e) allows the court to grant, if good cause is shown, an exception to 12.1(a) through (d).

Addressing a similar state alibi witness disclosure rule, the Supreme Court identified the interests vindicated by such rules:

> Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as "due process" is concerned, for the [alibi witness disclosure] rule, which is designed to enhance the search for truth in the criminal trial by insuring both

7

the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.

Williams v. Florida, 399 U.S. 78, 81-82 (1970) (footnotes omitted). The Advisory Committee Notes to Rule 12.1 also offer compelling justification for alibi witness disclosure:

> There are cases in which the identity of defense witnesses may be known, but it may come as a surprise to the government that they intend to testify as to an alibi and there may be no advance notice of the details of the claimed alibi. The result often is an unnecessary interruption and delay in the trial to enable the government to conduct an appropriate investigation. The objective of rule 12.1 is to prevent this . . . .

Fed. R. Crim. P. 12.1 Advisory Committee Notes.

Our circuit considered Rule 12.1(d) exclusion of alibi witness testimony in Davis, 40 F.3d at 1069, and United States v. Fitts, 576 F.2d 837 (10th Cir. 1978). Mr. Pearson notes that in Davis and Fitts, the defendants' attorneys were at fault for failing to comply with Rule 12.1(a). See Davis, 40 F.3d at 1076; Fitts, 576 F.2d at 838. In contrast, "[d]efense counsel in the present case attempted to comply with the dictates of Rule 12.1 as soon as he became aware of the mere possibility of an alibi defense." Aplt's Br. at 34. We agree with Mr. Pearson that his attorney acted diligently in informing the government and the district court of Mr. Person's alibi witness as soon as defense counsel learned of the witness. However, his attorney's diligence does not excuse Mr. Pearson's negligence. "[Mr. Pearson], through his attorney, advised the government on at least two

8

occasions that he did not intend to offer an alibi defense. Thereafter, on June 12, 1997, defense counsel became aware that an alibi defense may exist in this matter." Id. at 32. Defense counsel "became aware that an alibi defense may exist" on June 12 because that is the first date Mr. Pearson or his mother bothered to tell counsel [1] of her alibi testimony—that she had seen her son standing in her kitchen at the exact time and on the exact date of the robbery and killing—despite its obvious importance. Nor had Mr. Pearson's mother exculpated her son on the several occasions when she was questioned by the government during its investigation. As the very nature of Mr. Pearson's alleged alibi confirms that he and his mother would have known of it long before the deadline for submitting his alibi defense, he cannot show good cause, as required by Fed. R. Crim. P. 12.1(e), for failure to comply with Rule 12.1(a). The district court did not abuse its discretion in excluding Mr. Pearson's alibi testimony.

C.    Sufficiency of the evidence

Mr. Pearson made oral and written motions for judgment of acquittal due to

---

[1]    Both in his brief and at oral argument, Mr. Pearson's attorney was careful to protect his client's privilege in their communications regarding Mr. Pearson's defense. However, Mr. Pearson's counsel appropriately informed us that he could not claim    that he had knowledge of Mr. Pearson's alibi witness before July 12 but simply failed, through his own fault, to inform the government.

insufficiency of the evidence, which the trial court denied. When reviewing a jury's verdict for sufficiency of the evidence, we examine the record de novo and ask whether, taking the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. See United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.), cert. denied, 117 S. Ct. 226 (1996).

The evidence was sufficient to support the jury's verdict. Viewed in a light most favorable to the government, the testimony of Dominic's accomplices shows (1) that he discussed and planned the robbery with Eric several days before and on the day of the robbery and (2) handed an armed accomplice a gun and assisted in a robbery that obstructed interstate commerce and caused the death of Ms. Montgomery. Admittedly, Ms. Starks could not pick Dominic out of a photo array and helped the police construct a composite sketch of the unarmed robber that did not resemble Dominic. However, these facts do not force a contrary result because those most likely to recognize him, his cohorts, placed him at the scene of the crimes. Additionally, his testimony and receipt, offered as proof that he was at a jewelry store sometime around 9:00 p.m. on the night of the murder, are not exculpatory because the robbery didn't take place until around 10:00 p.m. Further, to the extent that Dominic's testimony contradicts Mr. Martin's testimony that he and Dominic drove around together from around 8:30 to around 9:00 p.m.,

a rational jury could have believed Mr. Martin or simply not cared about the conflicting testimony on this irrelevant point.  After examining the record de novo and taking the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found Dominic guilty beyond a reasonable doubt.

D.    Jury instructions on felony murder

Mr. Pearson contends that the felony murder jury instruction was erroneous. The instruction read, in relevant part:  "A killing is done with malice aforethought when it is done deliberately and with the intent to kill another person, or if it results from the commission of a robbery."  Rec. vol. I, doc. 189, Instruction No. 26.  In essence, the instruction followed the traditional felony murder rule by allowing the jury to find "malice aforethought" from Mr. Pearson's commission of the underlying felony.  Mr. Pearson contends that the federal murder statute, 18 U.S.C. § 1111(a), requires the jury to find "malice aforethought" independent of the commission of the underlying felony.

"We review de novo a timely challenge to a jury instruction to determine whether, considering the instructions as a whole, the jury was misled. . . . [R]eversal is not appropriate unless we have substantial doubt that the jury was fairly guided."  United States v. Winchell, 129 F.3d 1093, 1096 (10th Cir. 1997)

(internal quotation marks and citations omitted).

We have no doubt that the jury was fairly guided. Section 1111(a) incorporates the definition of murder, i.e., "the unlawful killing of a human being with malice aforethought," into its definition of felony murder. However, we interpret the "malice aforethought" requirement in § 1111 by reference to the common law, see Montoya v. United States Parole Comm'n, 908 F.2d 635, 638 (10th Cir. 1990), and at common law, "malice aforethought" is a term of art which has several definitions, including, in the felony murder context, proof of commission of the specified felony. See Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law §§ 7.1(a), 7.5(e)-(h) (2d Ed. 1986).

> At common law, the author of an unintended homicide is guilty of murder if the killing takes place in the perpetration of a felony. This in essence constitutes the doctrine of felony-murder (also known as the doctrine of constructive malice).
> . . . .
> In the typical case of felony murder, there is no malice in "fact" with respect to the homicide; the malice is supplied by the "law." There is an intended felony and an unintended homicide. The malice which plays a part in the commission of the felony is transferred by the law to the homicide. As a result of the fictional transfer, the homicide is deemed committed with malice; and a homicide with malice is, by definition, common-law murder.

2 Charles E. Torcia, Wharton's Criminal Law § 147 (15th ed. 1994).

Thus, to prove the "malice aforethought" element of felony murder, the prosecution only need show commission of the specified felony. See Montoya, 908 F.2d at 638; United States v. Flores, 63 F.3d 1342, 1371 (5th Cir. 1995);

12

United States v. Chischilly, 30 F.3d 1144, 1159-60 (9th Cir. 1994); United States v. Thomas, 34 F.3d 44, 48-49 (2nd Cir. 1994); cf. United States v. Sides, 944 F.2d 1554, 1558 (10th Cir. 1991) (holding that defendant's continuing participation in an armed robbery despite the fact that he was aware of a serious risk of death to the victims satisfied the element of malice aforethought); Michigan v. Aaron, 299 N.W.2d 304 (Mich. 1980) (providing a very comprehensive exploration of the history and rationale behind the felony murder doctrine). Therefore, we hold that the district court properly instructed the jurors that they could find Mr. Pearson guilty of § 1111(a) felony murder if they determined that Ms. Montgomery's killing resulted from the commission of a robbery.

E.    Mr. Pearson's requested lesser included offense instructions

Mr. Pearson asked the district court to instruct the jury on second degree murder and manslaughter as lesser included offenses to felony murder. The district court refused. "Whether an offense for which an instruction is sought actually qualifies as a lesser included offense of the offense charged is a question of law that we review de novo. However, we review the district court's decision as to whether there is enough evidence to justify a lesser included offense instruction for an abuse of discretion." United States v. Duran, 127 F.3d 911, 914

13

(10th Cir. 1997) (citation omitted), cert. denied , 118 S. Ct. 1389 (1998).

> [A] [d]efendant is entitled to a lesser included offense instruction if (1) there was a proper request; (2) the lesser included offense includes some but not all of the elements of the offense charged; (3) the elements differentiating the two offenses are in dispute; and (4) a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense.

United States v. Moore , 108 F.3d 270, 272 (10th Cir. 1997) (citing Fitzgerald v. United States , 719 F.2d 1069, 1071 (10th Cir. 1983)).  The district court properly denied Mr. Pearson's requested lesser included offense instructions because both fail the first half of the fourth Moore requirement:  A jury could not rationally convict him of either second degree murder or manslaughter.

After 18 U.S.C. § 1111(a) defines first degree murder, it describes second degree murder as "[a]ny other murder."  Replacing the word "murder" with its definition, found in the first sentence of § 1111(a), results in the reconstituted statutory expression of second degree murder as "any other unlawful killing of a human being with malice aforethought."  However, we must again look to the common law to satisfy the definition of "malice aforethought" as a term of art used to satisfy second degree murder.

Malice aforethought as an element of second degree murder is, as in felony murder, a type of constructive or implied malice.  See LaFave & Scott, supra , at 606-07; Torcia, supra , at 246-50.  However, whereas the commission of the specified felony supplies the constructive or implied malice necessary to satisfy

14

the malice aforethought element of § 1111(a) felony murder, second degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; (3) depraved-heart; or (4) commission of a felony when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a).  See LaFave & Scott, supra, at 648.

Under the facts of this case, a jury could not rationally convict Mr. Pearson of second degree murder because the robbery and accidental killing do not satisfy any of the types of implied malice aforethought required to prove the crime.  Mr. Martin testified, and neither Mr. Pearson nor the government disputed, that he accidentally fired the shot that killed Ms. Montgomery.  Thus, the only reason the government was able to convict Mr. Pearson of first degree murder was because Mr. Pearson's commission of the robbery constructively supplied the malice aforethought required to satisfy the definition of "murder" in § 1111(a).      While the underlying robbery is constructive or implied malice aforethought for first degree felony murder, neither the robbery nor the accidental killing satisfies the types of constructive or implied malice aforethought described above that are required to prove second degree murder.  Because Mr. Pearson's criminal acts do not satisfy any of the types of implied second degree murder malice aforethought, Mr. Pearson cannot be guilty of that crime.

15

His request for a manslaughter instruction also fails *Moore*'s fourth requirement. Title 18 U.S.C. § 1112 defines manslaughter:

> (a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
> Voluntary–Upon a sudden quarrel or heat of passion.
> Involuntary–In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. §1112(a). The accidental discharge of the gun in the commission of the robbery (1) does not constitute voluntary manslaughter under § 1112 because there was no sudden quarrel or heat of passion and (2) does not constitute involuntary manslaughter under § 1112 because robbery is an unlawful act that is a felony. Thus, a jury could not rationally convict Mr. Pearson of either type of manslaughter.

Because we conclude that both of Mr. Pearson's requested lesser included offense instructions fail *Moore*'s fourth requirement, we need not consider whether they satisfy *Moore*'s other prongs. The district court did not err in refusing to submit to the jury Mr. Pearson's requested lesser included offense instructions.

## III.   CONCLUSION

We affirm Mr. Pearson's convictions because Congress did have the

16

constitutional authority to enact § 1951, because the evidence was sufficient to support the convictions, and because the district court did not err when it refused to allow Mr. Pearson to submit a tardy alibi defense, instructed the jury on the elements of felony murder, and declined to submit Mr. Pearson's requested lesser included offense instructions to the jury.