**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 16 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DANIEL CARD,

    Defendant-Appellant.

No. 01-4116
(D. Utah)
(D.Ct. No. 2:99-CR-674-B-01)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

A jury convicted Daniel Card on charges stemming from the armed robbery of two credit unions. On appeal, Mr. Card presents three challenges to his convictions: (1) the government failed to give notice of an alibi rebuttal witness; (2) the evidence was insufficient to sustain his convictions; and (3) the government failed to disclose evidence relevant to the credibility of a police

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

officer who testified for the government.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Sara Beth Blackhurst was working at her desk when two men entered Alpine Credit Union on October 18, 1996.  The shorter of the two, later shown to be Mr. Card, pulled out a sawed-off shotgun and aimed it at Ms. Blackhurst.  The shorter robber ordered Ms. Blackhurst to get down on the floor and stood over her with the sawed-off shotgun pointed at her back, while the taller robber, later alleged to be William Leon,[1] forced one of the tellers to put money from two cash drawers into a bag.  The robbers made off with $16,549.

The credit union employees did not identify the robbers because both men wore large hooded sweatshirts, large dark sunglasses, and bandanas over their faces.  Ms. Blackhurst thought she saw the hands of the shorter robber, and told investigators he was Caucasian.  However, after viewing the surveillance photographs, she realized he wore gloves and she could not have seen his hands.  One of the tellers, Stephanie Bringhurst, testified she could see their foreheads

---

[1] The jury did not reach a verdict on the charges against Mr. Leon stemming from this robbery.

and both robbers were Caucasian. However, the other teller working at the credit union during the robbery testified she could not discern the shorter man's race.

In a separate incident, two armed, masked men entered Beehive Credit Union on December 13, 1996. The shorter robber, later shown to be Mr. Card, jumped over the counter into Cari Cooper's teller station and ordered her to get off the telephone and on the floor. Then, the taller robber moved behind the counter and pointed the barrel of a sawed-off shotgun at Ms. Cooper's head.

The shorter robber held a small pistol in his left hand, when he threatened two other tellers and a customer, forcing them to get down on the floor. Then he ordered a teller to put money in a bag. The teller placed a dye pack from each drawer into the bag. Very shortly after the robbers left the credit union, a passerby found a grocery bag and money covered in red dye scattered in the road about one-half block west of Beehive Credit Union. Of the $1,156 stolen from the credit union, police recovered $1,146.

Once again, the robbers could not be identified. They were covered from head to toe, with sheets over their heads, masks covering their faces and gloves on their hands. The shorter robber wore a green mask which the tellers described

at trial. The tellers and a customer told police the shorter robber was either African-American or Hispanic, based on his voice and the language he used.

A grand jury indicted Daniel Card and William Leon for the armed robberies of the two credit unions. Specifically, Mr. Card was charged with two counts of armed credit union robbery in violation of 18 U.S.C. § 2113(a) and (d), two counts of using and carrying a sawed-off shotgun during the robberies in violation of 18 U.S.C. § 924(c)(1), and two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

After jury selection, the government dismissed the felon in possession charges against Mr. Card. At trial, the government introduced the sawed-off shot gun and a mask used in the second robbery. Mr. Card's brother also testified Mr. Card told him about the robberies. After the jury convicted Mr. Card on each of the four remaining counts, the district court sentenced him to 406 months in prison, to be followed by five years of supervised release. Mr. Card filed a timely notice of appeal.

**DISCUSSION**

Impeachment of Alibi Witness

In the first challenge to his convictions, Mr. Card argues the district court erred when it did not exclude testimony and records used to impeach Mr. Card's alibi witness. During a motions hearing, Mr. Card requested "the fruits of any investigation" concerning school records. The district court denied the request and declined to "require the government to turn over everything they get as a result of their efforts." At trial, Mr. Card's girlfriend, Catherine Cope, attempted to provide an alibi for him by vouching for his whereabouts on the morning of the first robbery. Ms. Cope testified they drove to Salt Lake City, Utah, with her children on October 18, 1996. She testified they left their home in Orem, Utah, "early in the morning, possibly 8:00, 8:30," arriving at her sister's house in Salt Lake City around 9:00 or 9:30 a.m. The robbery took place at 9:30 a.m. During its cross-examination, the government attacked her account of the day's events. Even though the government was armed with a school record signed by Ms. Cope that showed she checked her son out of school at 11:39 a.m., October 18, 1996, Ms. Cope denied checking her son out of school at 11:39 a.m. that day.

The government then called the school secretary as a rebuttal witness. The secretary authenticated and laid foundation for the school record and testified she

-5-

checked Ms. Cope's son out of school at 11:39 a.m. on October 18, 1996. By impeaching Ms. Cope's testimony concerning their whereabouts, the government was able to refute Mr. Card's alibi for the first robbery, which occurred at 9:30 a.m. on October 18, 1996.

Mr. Card argues the government violated Federal Rule of Criminal Procedure 12.1 by failing to give Mr. Card notice of the secretary's testimony and the school record. Rule 12.1(a) requires the defendant to give notice of his intention to offer an alibi defense and the names and addresses of alibi witnesses within ten days of a written demand from the government. *United States v. Pearson*, 159 F.3d 480, 483 (10th Cir. 1998). "Rule 12.1(b) places a reciprocal witness identification requirement on the government, requiring it to disclose witnesses it intends to use to ... rebut the testimony of the defendant's alibi witnesses." *Id.* The rule places a continuing duty to disclose on the parties. *Id.* Under Fed. R. Crim. P. 12.1, the court "may" exclude the testimony of any witness not disclosed in accordance with the rule. *Pearson*, 159 F.3d at 483. We review the district court's decision to allow the alibi rebuttal evidence for an abuse of discretion. *See id.*; *United States v. Bissonette*, 164 F.3d 1143, 1145 (8th Cir. 1999).

Mr. Card's claim the district court committed structural constitutional error when it ruled "the government has no duty to give notice of its alibi rebuttal witnesses" is without merit. First, he misapprehends the district court's ruling. The district court merely ruled the government was not required to provide the defense with a copy of the school record indicating Mr. Card's girlfriend checked her child out of school at 11:39 a.m. on the day of the first robbery. The court did not make any ruling as to whether Mr. Card was entitled to notice of a rebuttal witness. Second, the government did disclose the rebuttal witness. It included the custodian of records for Alpine School District in its Notice of Alibi Rebuttal Witnesses on December 1, 2000. Therefore, contrary to Mr. Card's polemic, Federal Rule of Criminal Procedure 12.1(b), requiring disclosure of *witnesses*, is not implicated.

We turn next to whether the district court improperly admitted the school records. Rule 12.1 does not require the production of alibi rebuttal documents. Although Fed. R. Crim P. 16 sometimes requires the voluntary production of documents, there is no general duty to produce documents that may be offered solely as rebuttal evidence. The Rules require disclosure of rebuttal evidence only if the evidence is material to the preparation of a defense for the defendant. *See* Fed. R. Crim. P. 16(a)(1)(C). Rebuttal evidence is only material to the

defense "if it could be used to counter the government's case or to bolster a defense," and is not "deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993).

Furthermore, Mr. Card knew the government subpoenaed the school record to rebut his alibi and he had access to the same record. Indeed, contrary to Mr. Card's claim he had "no means of knowing that the alibi defense he presented was untrue or inaccurate in any way," Mr. Card's girlfriend obtained a copy of the school record the week before she testified. Based on the record before us, we are satisfied the district court did not abuse its discretion when it admitted the school record into evidence and Mr. Card suffered no prejudice by its admission.

Sufficiency of the Evidence

In the second challenge to his convictions, Mr. Card argues the evidence was insufficient to sustain the guilty verdicts. "Our standard of review is well established. The sufficiency of the evidence to support a criminal conviction is a question of law to be reviewed *de novo*. In doing so, however, we view the evidence and all reasonable inferences therefrom in the light most favorable to the jury verdicts." *United States v. Higgins*, 282 F.3d 1261, 1274 (10th Cir. 2002).

Mr. Card contends the evidence at trial was insufficient to support his conviction because: 1) both robbers of Alpine Credit Union were white and Mr. Card is African-American; 2) the shorter robber in the Beehive Credit Union robbery was left-handed and Mr. Card is right-handed; 3) none of the witnesses saw Mr. Card with any red dye on his person or his clothing and there was no red dye on his shotgun; 4) the shotgun "was not exclusively tied to [Mr.] Card;" 5) there were no prints or other forensic evidence indicating Mr. Card had ever been in the recovered truck or used or touched any of the disguises worn by the robbers; and 6) the government's witnesses "suffered from well known biases," they were not credible and their testimony was inconsistent.

The majority of Mr. Card's contentions invite us to enter the province of the jury. This we will not do. "[O]ur function as a court of review prevents us from re-weighing the testimony and coming to a conclusion at odds with the one reached by the jurors." *Higgins*, 282 F.3d at 1275. We must uphold a conviction if "any rational jury could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Smith*, 131 F.3d 1392, 1399 (10th Cir. 1997), *cert. denied*, 522 U.S. 1141 (1998). We will not, as a matter of law, hold testimony incredible unless it is unbelievable on its face, *i.e.*, facts that were physically impossible for the witness to observe or "events that could not have

occurred under the laws of nature." *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir.) (quotation marks and citations omitted), *cert. denied*, 502 U.S. 835 (1991). The inconsistent testimony, biases and credibility issues were all before the jury when it deliberated. The jury was free to accept the government witnesses' testimony and to disbelieve Mr. Card's "protestations of innocence." *Higgins*, 282 F.3d at 1275. The apparent inconsistencies in the witness accounts of the robberies, and the criminal background and motive to lie of some key government witnesses, were for the jury, not this court, to resolve. *Tapia*, 926 F.2d at 1562; *Smith*, 131 F.3d at 1399.

Viewing the evidence in the light most favorable to the verdict, a rational jury could conclude Mr. Card committed both robberies. The jury did not have to embrace the assumptions advanced by Mr. Card. In light of the credit union video tape and all the witnesses' testimony, the jury could reasonably believe the tellers saw the fair skin of the taller robber and mistakenly assumed both robbers were Caucasian. The jury did not have to assume the shorter robber was left-handed simply because he held the gun in his left-hand. And, the alleged paucity of direct evidence of Mr. Card's guilt is not dispositive in a sufficiency of the evidence claim. *See Smith*, 131 F.3d at 1399 (holding a verdict may be based solely on testimony of allegedly unreliable witnesses even if it is not corroborated

by physical evidence).

Our independent review of all the evidence also satisfies us the evidence linking Mr. Card to the robberies is more than sufficient. Mr. Card's girlfriend presented an apparently false alibi at trial concerning his whereabouts during the first robbery. And, an eyewitness identified the mask found behind a coffee table in Mr. Card's home as the one worn by the taller robber during the second robbery. Mr. Card purchased a shotgun from VanWagon Finance two days before the first robbery. When Mr. Card's brother saw him with a sawed-off shotgun, Mr. Card told his brother he purchased it from VanWagon's. Police recovered the shotgun from a man who testified he bought the gun from Mr. Card for $35. Witnesses identified this sawed-off shotgun as the one used in both robberies. Perhaps most damaging, Mr. Card's brother testified Mr. Card told him about both robberies, the details of which were corroborated by eyewitness testimony.

Based on this evidence, we conclude the government presented sufficient evidence to sustain Mr. Card's convictions and reject his challenge to the verdict based on the sufficiency of the evidence.

*Brady* Material

In the final challenge to his convictions, Mr. Card contends the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), and the district court erred when it denied his motion for a new trial. Specifically, he claims the government improperly failed to disclose evidence he could have used to impeach the credibility of a police detective who testified for the government.

After the trial, but before sentencing, the prosecutors notified defense counsel that a Provo city police detective and a defendant "testified discrepantly" at a suppression hearing in another case. The judge in the unrelated case found the defendant's version of the events during an interview was more consistent with the extrinsic evidence than the detective's version and granted the defendant's motion to suppress evidence.

Mr. Card filed a motion to set aside the jury verdict and for a new trial, arguing he would have moved to suppress all evidence obtained by the detective and would have aggressively challenged the detective's credibility if he had been aware of the detective's "perjured testimony" in the other case. After a hearing, the district court denied the motion.

Mr. Card claims "[t]he *Brady* doctrine and due process of law entitle him to a new trial wherein he can use [the evidence undermining the detective's credibility] in his defense." *Brady v. Maryland* held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). To establish a violation under *Brady* and *Giglio*, the defendant must demonstrate "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Combs,* 267 F.3d 1167, 1172 (10th Cir. 2001). We review the district court's denial of a motion for a new trial based on allegations of a *Brady* violation *de novo*. *Id.*

The government concedes it suppressed evidence in this case.[2] However, the parties disagree on whether the evidence was favorable to Mr. Card and

---

[2] The government recognizes neither bad faith nor culpability is required and knowledge of evidence on the part of one Assistant United States Attorney is imputed to the entire office.

whether the evidence was material. According to Mr. Card, "under *Brady*, [Mr. Card] is entitled to reversal, because there is a reasonable probability that the jurors would have acquitted or failed to reach a verdict in [Mr. Card]'s case, had they known of the government's key investigator's past violation of the Constitution, dishonesty under oath, and lack of professional integrity." On the other hand, the government argues "absent any suggestion that [the detective] committed perjury," a different trial court's decision to grant a motion to suppress evidence obtained by the detective does not bear on the detective's credibility and therefore is not "impeachment evidence subject to disclosure under *Giglio*."

We will first consider whether the evidence was favorable to Mr. Card. Impeachment evidence is favorable to an accused if it may make the difference between conviction and acquittal. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The *Brady* claimant must demonstrate a reasonable probability the evidence suppressed would have changed the outcome of the proceeding. *Id.* Perjury requires intentionally false testimony *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

The district court aptly noted Mr. Card was making "quite a leap" to argue the detective committed perjury or lied. A court may discount witness testimony

even though the witness was not dishonest or intentionally misleading if, for example, the falsity was "a result of confusion, mistake, or faulty memory." *Id.* The district court concluded Mr. Card did "not establish[] that the alleged misconduct of [the detective] was of the level as suggested, namely perjury or some kind of intentional wrongdoing."[3]  (Vol. XII at 22.)

After a careful review of the record, we agree with the district court.  Mr. Card did not prove the detective committed perjury or any intentional wrongdoing.  Therefore, Mr. Card failed to prove the evidence concerning the detective was impeachment evidence at all.  It did not bear on the credibility or reliability of the detective's testimony in Mr. Card's case and therefore was not "favorable to" him.  *See Combs*, 267 F.3d at 1172.  As such, Mr. Card did not prove a *Brady* violation.

We need not reach the materiality issue because Mr. Card did not prove the impeachment evidence was favorable to his defense.  The district court did not err when it denied Mr. Card's motion for a new trial based on the evidence

---

[3] In what appears to be an abundance of caution and charity, the district court delayed its final ruling, allowing Mr. Card to present additional briefing on the issue and affording him the opportunity to request an evidentiary hearing.  Counsel failed to submit additional briefing or to request an evidentiary hearing.

concerning the detective.

## CONCLUSION

Therefore, we **AFFIRM** Mr. Card's conviction and sentence.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge