**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 6 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JESSE ALLEN VAZIRI, COREY
JESS ADKINS, and JACQUELINE
LOU QUARTERMAN,

Defendants - Appellants.

Nos. 97-8117, 98-8010
& 98-8026

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 97-CR-024-D)

Gerald M. Gallivan, Oklahoma City, Oklahoma (Michael H. Reese, Wiederspahn, Liepas & Reese, P.C., Cheyenne, Wyoming, joining with him on the briefs), for Appellant Vaziri.

Michael H. Reese, Wiederspahn, Liepas & Reese, P.C., Cheyenne, Wyoming, for Appellant Adkins.

Thomas B. Jubin, Cheyenne, Wyoming (Michael H. Reese, Wiederspahn, Liepas & Reese, P.C., Cheyenne, Wyoming, joining with him on the briefs), for Appellant Quarterman.

Patrick J. Crank, Assistant United States Attorney (David D. Freudenthal, United States Attorney, and David A. Kubichek, Assistant United States Attorney, with him on the brief), Casper, Wyoming, for Appellee.

Before **PORFILIO** , **ANDERSON** , and **CAMPBELL** ,[*] Circuit Judges.

**ANDERSON** , Circuit Judge.

Jesse Vaziri, Corey Adkins, and Jacqueline Quarterman were convicted in a joint trial in the district court of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, as well as various possession and distribution charges, violations of 21 U.S.C. § 841(a)(1).  They separately appeal their convictions and sentences.  Due to the interrelated factual and legal premises of their appeals, we combine the cases for purposes of disposition.  [1]

Appellants challenge the fairness of their trial, arguing that perjured testimony went to the jury uncorrected and that witnesses illegally testified in exchange for promises of leniency from the government.  Appellants also contest their conspiracy convictions specifically, arguing that there was insufficient evidence to support the jury's verdicts, that general verdicts on a multiple-object

---

[*]The Honorable Tena Campbell, District Judge, United States District Court for the District of Utah, sitting by designation.

[1]In general, where only one or two appellants raise an issue, we will so specify.  We note that Adkins has filed a motion to adopt the briefs of the other two appellants.  We grant this motion.  When we discuss arguments specifically raised only by Quarterman and/or Vaziri but relevant to Adkins' appeal, it is to be understood that we are also treating these issues as being raised by Adkins.

conspiracy charge were improperly rendered, and that the jury was improperly instructed. Finally, each appellant raises sentencing issues: Quarterman and Adkins challenge obstruction of justice enhancements; Quarterman, Adkins, and Vaziri contest enhancements for weapons possession; and Adkins attacks the quantity of drugs attributed to him.

For the reasons discussed below, we affirm appellants' convictions and sentences.

## I. BACKGROUND

Jacqueline Lou Quarterman and two of her sons, Corey Jess Adkins and Jesse Allen Vaziri, lived in Wyarno, Wyoming, during early 1997. Wyarno, near Sheridan, Wyoming on a two-lane highway, consisted of a bar/post office, Quarterman's log house, and several trailers. Quarterman owned the entire town.

On March 15, 1997, Quarterman, Adkins, and Vaziri were arrested for drug offenses, and on May 15, 1997, they were named in a five-count superseding indictment. Count One charged all three with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846. Count Two charged Quarterman and Vaziri with distribution of LSD and aiding and abetting under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Three charged Quarterman and Adkins with possession with intent to distribute methamphetamine and aiding and abetting

under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Four charged Vaziri with distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Count Five is not involved in this appeal.

At a joint trial held August 19-September 2, 1997 in the district court, a jury convicted each defendant as charged in Counts One through Four. The government presented extensive evidence, only some of which is detailed here.

Mark Addington served as an informant during the government's investigation. He testified at trial that he was arrested on January 7, 1997, for marijuana possession, and the next day he agreed to cooperate with the Wyoming Division of Criminal Investigation (DCI) in exchange for a recommendation of a reduced charge. At that time, Addington began placing telephone calls to Quarterman as part of an undercover operation.

Addington testified that he participated in a series of controlled drug buys during which he wore a recording device. (At trial, prosecutors introduced recordings made with the device.) On January 23, 1997, he called Quarterman to arrange a drug buy, then went to her residence. In her bedroom he was introduced to Vaziri and a woman named Kelly. Kelly and Vaziri left the bedroom. Addington then purchased, from Quarterman, a gram of cocaine for $100 and six hits of LSD for $6 apiece. As Quarterman handled the LSD, Addington was

-4-

recorded saying, "[L]ook like you got quite a bit there." R. Vol. 15, Test. of Addington at 55.

According to Addington, on January 30, 1997, he called Quarterman and arranged to meet her that same day at a set location in Sheridan to purchase drugs. In Sheridan, Vaziri and Quarterman were waiting for him. Quarterman got into Addington's car. Addington purchased 100 hits of LSD from her for $500.

Addington placed additional phone calls to Quarterman on March 7, March 10, and March 12, 1997. In these phone calls he arranged for another drug transaction, and asked if he could bring along his "friend" from Red Lodge, Montana, "John Pettimore" (DCI Special Agent Chris Peters). On March 12 he and Agent Peters traveled to Wyarno, where Agent Peters bought one-half ounce of methamphetamine from Quarterman. Agent Peters testified at trial that during this transaction, Quarterman told Agent Peters that the methamphetamine had come from California. Peters asked who had gone to get it, and according to Peters, Quarterman replied, "My sons." R. Vol. 18, Trial Transcript [hereinafter Tr.] at 538. Peters asked if she could get him an entire ounce of methamphetamine. Quarterman told Peters she didn't know if she wanted to sell an ounce, but that she'd "see if Corey would." R. Vol. 18, Tr. at 541.

The government introduced a recording of a March 13, 1997 phone call from Addington to Quarterman. Wyoming DCI Agent Louey Williams monitored

the telephone call when it was made, prepared a transcript of the call, and testified at trial that the transcript was accurate. [2] According to that transcript, the following exchange took place after Addington asked Quarterman if Adkins would be willing to sell an entire ounce of methamphetamine:

[Quarterman]: I uh, I kinda doubt whether he, just a second let me . . . (Talking to someone in her home: Jessie, Jessie? Do you have any idea um, how much Corey has left? [Jesse Vaziri]?: No, I don't. Quarterman: He wouldn't want to sell a whole ounce would he? [Vaziri]: No.) I was just asking my other son if he . . .

[Addington]: Uh huh. Probably not then?

[Quarterman]: Probably not. Uh, I wasn't sure. I, I haven't even talked to him since he got back.

Tr. of Phone Call, Appellee's Add. at 36. Addington testified that he recognized the voice in the background as that of Jesse Vaziri.

On the evening of March 13, 1997, Peters and Addington returned to Wyarno to make additional purchases. Peters testified that Quarterman was not

---

[2]This transcript was conditionally admitted as evidence, but the jury listened to this particular recording without the aid of the transcript, because the prosecution withdrew the transcript when defense counsel lodged objections. The transcript and not the tape itself was included in the record on appeal. We may properly refer to the transcript as an aid to our decision. Cf. United States v. Watson, 594 F.2d 1330, 1336 (10th Cir. 1979) (approving jurors' limited use of transcripts not admitted as evidence). Because appellants do not contest the contents of this conversation as a factual matter, and given the limited issues raised in this appeal, we need not make any conclusive determination as to the accuracy of the transcript; we treat it only as a permissible interpretation.

home, but Vaziri was. Vaziri sold Peters two grams of methamphetamine. Vaziri told Peters that this methamphetamine had been "fronted" to Vaziri by another person, and that therefore he would have to have $200 for it in order to pay his debt.[3] Vaziri also told Agent Peters that he had supplied the LSD that Quarterman sold to Addington on January 30, 1997, and that he had an LSD source in Denver, Colorado. R. Vol. 18, Tr. at 554-55.

On March 14, 1997, Peters and Addington again traveled to Wyarno to meet Quarterman. At trial tape recordings were played and Peters testified to explain the conversations. He testified that at first Quarterman sold him only one-quarter ounce of methamphetamine. He asked Quarterman whether she had any more, and she said no but offered to see if Adkins had any. Peters told her to see if she could get him an ounce. She said Adkins might be willing to sell an ounce to get rid of it, because while he was in California, there had been rumors that he was going to get busted. Peters testified that Quarterman then left the house; when she returned she told Peters that Adkins would not sell an entire ounce. She said that Adkins preferred to sell by the gram because he had been cheated in California and had to make up the difference. Peters told her that he wanted four more grams. Quarterman then sold him two more grams herself, and

---

[3]Apparently Vaziri obtained this quantity from persons outside his family. Later laboratory analysis confirmed that this methamphetamine sold by Vaziri likely came from a different source than that sold by Quarterman.

sent a person named Bart to tell Adkins, who lived in a trailer behind Quarterman's house, that she needed two additional grams. Bart left, then returned and related that Adkins was bringing methamphetamine to the house. Adkins came to the house and he and Quarterman went into her bedroom. When Quarterman emerged from the bedroom she handed Peters two more grams of methamphetamine. Agent Peters asked Quarterman if $60 per gram was an acceptable price. Quarterman turned to Adkins and asked if $60 was all right; Adkins replied, "[I]t's your deal now." R. Vol. 18, Tr. at 603. Peters eventually paid Quarterman $180 for the two grams. Peters and Addington then left.

According to Peters' testimony, during this visit Quarterman asked Peters which he had liked better, the methamphetamine she had sold him or the methamphetamine Vaziri had sold him. She also discussed Adkins' recent trip to California, stating that Adkins had bought a total of about five ounces. [4] She said Adkins had given her half of those amounts. She told Peters that she didn't sell in ounce quantities because she could get in more trouble that way.

Addington testified that at his home on the night of March 14, 1997, at 11:00 PM his wife answered the phone and the caller immediately hung up. At about 11:45 PM he answered another telephone call. The caller stated, "Pig,

---

[4]According to Peters, she stated that Adkins had first obtained four ounces and tried to get a fifth ounce, but that Adkins had been cheated, so this last "ounce" was actually not a full ounce.

you're f------ the wrong people. You're going to pay, bitch," and then hung up. R. Vol. 23, Tr. at 1510; see also R. Vol. 15, Test. of Addington at 80-81; R. Vol. 28, Adkins Sent. Tr. at 27. Addington called Agent Williams to report the phone call. Williams testified that Addington could not at that time positively identify the caller, but that Addington told him he thought it might have been Adkins. Williams told Addington to report any other calls.

Addington testified that at about 2:00 AM on March 15, 1997, he received a phone call from Quarterman. Quarterman asked where "John" (Agent Peters) had been staying. Addington replied that he was staying at the Mill Inn (the motel in Sheridan where Peters in fact was staying). Quarterman told Addington that Adkins had obtained telephone records from the Mill Inn showing calls to the DCI, the sheriff's office, Cheyenne, and Addington's residence. She asked him whether he knew if "John" was an undercover agent. Addington said no. Addington heard Adkins in the background say, "[A]sk him if he's a f------ narc." R. Vol. 15, Test. of Addington at 93. Addington reported this call to Agent Williams. Williams testified that after the call from Quarterman with Adkins in the background, Addington was able to identify the 11:45 PM caller more positively as Adkins.

On March 15, 1997, Quarterman, Adkins, and Vaziri were arrested, and each gave statements to police. Agent Williams testified that Quarterman was

arrested at her residence. He testified that she admitted to having the money Agent Peters used to buy drugs from her, and that she corroborated her earlier statement to Agent Peters that the methamphetamine she sold him had come from the quantities Adkins had recently brought back from California. According to Williams, she admitted to the January 23, 1997 and January 30, 1997 sales of cocaine and LSD to Addington. She also admitted transporting and reselling methamphetamine she obtained in Bakersfield, California: one-half ounce in October 1996, one ounce sometime between October 1996 and February 1997, and one ounce around Presidents' Day 1997. On this last trip, she traveled with a friend to Las Vegas, then went on to Bakersfield. Corroborating this testimony by Williams, the government presented evidence of two wire money transfers to Quarterman: one for $948 on February 21, 1997, received in Las Vegas, Nevada, and another for $898 on February 23, 1997, received in Bakersfield, California. Williams testified that telephone records from Quarterman's bar showed numerous calls to Bakersfield during these time periods. He also testified that Quarterman admitted to having the Mill Inn records.

Agent Williams testified that Adkins was arrested while driving a blue van, with his girlfriend Candace Kinnaird riding in the passenger seat. Wyoming DCI Agent Mike Burnett testified that Adkins admitted that two weeks earlier he had traveled to Bakersfield with Kinnaird and another couple, and that he had

purchased the blue van to get home when their car broke down. According to Burnett, Adkins denied all involvement in drug activity, and specifically denied having transported drugs from California. Adkins instead explained that he had heard of another person (whom he refused to name) from Story, Wyoming, who, during this same time period, had brought methamphetamine and marijuana from Humboldt, California, for distribution in the Sheridan area. Burnett testified that Adkins acknowledged having obtained the Mill Inn records to find out if an undercover officer was working in Sheridan, and said he had done so to protect people he knew. A triple-beam scale was seized from Adkins' trailer; later testing showed Adkins' fingerprints on the scale, as well as traces of marijuana, methamphetamine, and cocaine.

Wyoming DCI Officer Michael Wenz testified that after Vaziri was arrested, he admitted to transporting one ounce of methamphetamine from Bakersfield in the spring of 1996, and to reselling it in quantities ranging from one-quarter gram to one gram. Vaziri admitted to another such trip four months later when he and a cousin obtained two ounces of methamphetamine for resale. Vaziri also stated that on January 23, 1997, he purchased 250 hits of LSD in Denver, Colorado, of which he resold 126 hits and used 4 hits. He acknowledged selling two grams of methamphetamine to Agent Peters on March 13, 1997.

Richard Wiberg testified under immunity that he and his girlfriend had purchased methamphetamine from Quarterman, Adkins, and Vaziri numerous times during the fall of 1996. He testified that each charged roughly the same price. He testified that in November 1996 he believed he had been shorted by them, and in retaliation sold Quarterman and Vaziri a fake sheet of LSD for $150. After this incident Adkins came to Wiberg's residence and threatened him that he would have "[t]o pay the money back or watch [his] back because [he] would be taken care of if [he] didn't pay back the money." R. Vol. 22, Tr. at 1402.

At sentencing hearings, Agent Williams testified that on March 15, 1997, during the execution of a search warrant, he found a 9mm semiautomatic rifle and a .22 semiautomatic rifle in Quarterman's residence. Adkins' fingerprints were found on the .22 and on .22 ammunition recovered from his trailer. Williams further testified that Quarterman told him that the .22 rifle belonged to her nine-year-old son Hunter. She said the 9mm rifle belonged to Adkins. Williams testified that Vaziri, who was living with Quarterman at the time of his arrest, told Agent Wenz that both guns belonged to Adkins, and that two to four weeks prior to their arrest Adkins had given the guns to Vaziri because Adkins was a convicted felon. There was also evidence that the 9mm gun was on Quarterman's dining room table on March 14, 1997; that during Agent Peters' visit that day,

-12-

Agent Peters asked about buying it; and that Quarterman told him he would have to talk to Adkins about that.

Each defendant was sentenced separately. Quarterman received 108 months imprisonment for each count, to be served concurrently; Adkins received a total of 200 months; Vaziri received concurrent sentences of 78 months for each count.

## II. DISCUSSION

### A. Presentation of Allegedly Perjured Testimony

All three appellants contend that perjured testimony was presented at trial and that this perjury went to the jury uncorrected, due to errors by the prosecutor and/or the court. A conviction obtained by the introduction of perjured testimony violates due process if (1) the prosecution knowingly solicited the perjured testimony or (2) the prosecution failed to correct testimony it knew was perjured. Napue v. Illinois, 360 U.S. 264, 269 (1959). "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue, 360 U.S. at 271) (internal quotes and alterations omitted).

In appellants' briefs on appeal, only Quarterman has identified precisely what testimony was allegedly perjured–the testimony of Mark Addington

regarding his relationship with Quarterman, which was relevant to Quarterman's entrapment defense. [5] Addington first testified on direct examination that he had never bought drugs from her before the undercover operation, and that he knew she sold drugs because he had met her in a bar in December 1996 after he had smoked some marijuana she had sold to his friend. On cross-examination by counsel for Vaziri, Addington testified that he had met Quarterman once prior to December 1996, through a mutual friend named "Donna." He described it as "just a kind of hi and bye thing" in a bar. R. Vol. 15, Test. of Addington at 108. Next he admitted that he had heard that Quarterman had a crush on him. On cross-examination by counsel for Adkins, Addington admitted having conversed with Quarterman at a house party. Then, on cross-examination by counsel for Quarterman, Addington admitted that one-and-a-half to two years prior to the undercover operation, he had invited Quarterman to a party at his home, had kissed her, went to bed with her to have sex, and woke up in bed with her. On redirect, Addington testified as follows:

Q: Did you have sex with her, Mr. Addington?

---

[5]It became clear at oral argument that Adkins' and Vaziri's arguments regarding the alleged perjury are essentially the same as Quarterman's, and therefore we will allow all three the benefit of Quarterman's specificity.

Adkins and Vaziri refer to allegedly perjured testimony by Jeff Burfiend as well. Neither, however, appears to make any attempt to identify precisely what false statements Burfiend made, and therefore we cannot review this claim.

-14-

A:     No, I did not.

Q:     Then how did she wake up in your apartment the next
       morning?

A:     I woke up.  I had passed out.  She was in bed with me.  I
       believe we went back to have sex and I passed out.

R. Vol. 15, Test. of Addington at 202.  Counsel for Vaziri and Adkins then

conducted recross-examination.  Later, when Addington had finished testifying

and the jury had been excused, the court told Addington it doubted the

truthfulness of some of his testimony, mentioned the possibility of perjury

charges, and warned Addington not to say another word.

At the end of trial, the prosecuting attorney and counsel for Quarterman

both emphasized Addington's relationship with Quarterman and the fact that he

may have lied about it.  The prosecutor specifically pointed out that Addington

had misrepresented the nature of his relationship with Quarterman, and told the

jurors, "if you think someone knowingly lied to you, folks, in this courtroom, you

can completely disregard their testimony if you want to. . . . Or you can give it

such weight and credence as you think it deserves."  R. Vol. 24, Tr. at 1935.  He

continued by arguing that Addington's sexual relationship with Quarterman had

"nothing to do with entrapment."  R. Vol. 24, Tr. at 1936.  Counsel for

Quarterman also highlighted Addington's relationship with Quarterman, arguing

that Quarterman had been entrapped.

-15-

Over objections by the prosecution, the court gave an instruction on entrapment. See R. Vol. 24, Tr. at 1816; R. Vol. 25, Tr. at 2031-32. The court also gave the following instruction:

> If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters. You may reject all of the testimony of that witness or give it such weight or credibility as you may think it deserves.

R. Vol. 25, Tr. at 2011.

Appellants argue that Addington gave perjured testimony that went to the jury uncorrected. We disagree. Inconsistencies in Addington's testimony were exposed on cross-examination, emphasized on redirect, and brought out again in closing arguments. Although Addington appears to have remained reluctant throughout his testimony regarding the relationship, it is plain from the record that the jury was apprised of the possibility that Addington had had a sexual relationship with Quarterman and had lied to them about it.

Quarterman points to the court's statements to Addington as evidence that Addington's allegedly perjured testimony went to the jury uncorrected. On August 21, 1997, Addington had finished testifying and the jury had been dismissed for the day, when the court, citing an "obligation" to ensure the truthfulness of testimony, expressed doubts about some of Addington's statements:

During the course of your testimony here, you've said in response to a question by defense counsel that you acknowledge that you had heard that Jackie Quarterman had a crush on you; and while I don't have the testimony verbatim, it is my recollection that you left the jury with the impression that your relationship was a relationship of one drug user to another and that you had no other special hold on this defendant.

Well, I don't think it is an entirely truthful statement to say that you heard from people that she had a crush on you. That may be the case, of course, but I would think that finding that defendant in your bed would be a good hint.

R. Vol. 16, Tr. at 455. The court then admonished Addington not to say another word because he risked prosecution for perjury.

Taking these remarks in context, we read the court's statements as indicating only that Addington's initial statements about his relationship with Quarterman left the jury with a false impression, not that the jury ultimately was unaware of the nature of the relationship. The court is referring to blatant inconsistencies of which–by that point, when Addington had admitted waking up in bed with Quarterman–the jury must have been well aware. Furthermore, the judge made this statement long before closing arguments, where the prosecution as well as defense counsel made additional efforts to highlight inconsistencies in Addington's testimony. The jury could not possibly have been left with the impression that Addington's relationship with Quarterman was simply that of one drug user to another.

-17-

Quarterman also argues that the court's admonition to Addington prevented the correction of his perjury. It is true that when, after a witness has finished testifying, the prosecution discovers that its witness has perjured himself, "then in the interests of justice they should be allowed to reopen direct and present truthful testimony." Tapia v. Tansy, 926 F.2d 1554, 1563 n.15 (10th Cir. 1991). Here, reopening direct was not necessary, because (as we have just explained) cross-examination and redirect had already exposed the alleged perjury.

We conclude that the jury was properly apprised of the possibility of false testimony, and that at that point it was for the jury to settle any related questions of credibility.

## B. United States v. Singleton

Appellants argue that various witnesses testified at trial pursuant to offers of favorable treatment by the government, in violation of the rule of United States v. Singleton, 144 F.3d 1343 (10th Cir.), vacated & reh'g en banc granted, 144 F.3d 1361 (10th Cir. 1998). Defense counsel did not raise the Singleton issue at trial. Reviewing only for clear error, we conclude that the district court was not required to raise the issue on its own motion in anticipation of Singleton.

## C. Conspiracy Issues

Each appellant raises various issues regarding the sufficiency of evidence and the propriety of jury instructions regarding Count One of the indictment, the conspiracy charge.

### 1. Insufficiency of the Evidence and Variance

Adkins and Vaziri contend that there was insufficient evidence to convict them of any conspiracy to distribute controlled substances. In addition, Quarterman and Vaziri argue that there was a prejudicial variance between Count One of the indictment and the evidence of conspiracy presented at trial. These latter claims regarding variance are also essentially arguments about the sufficiency of evidence: they argue that the evidence was insufficient to show the single unitary conspiracy charged in the indictment. See United States v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990), overruled on other grounds by United States v. Gaudin, 515 U.S. 506 (1995) (overruling recognized in United States v. Wiles, 102 F.3d 1043, 1054 (10th Cir. 1996) (en banc)).

In addressing these claims challenging the sufficiency of the evidence, we review the record de novo, viewing the circumstantial and direct evidence along with the reasonable inferences therefrom in the light most favorable to the government, to determine whether a reasonable jury could find Quarterman,

Adkins, and Vaziri guilty of a single conspiracy beyond a reasonable doubt.    See United States v. Voss , 82 F.3d 1521, 1524-25 (10th Cir. 1996);    Daily , 921 F.2d at 1007.  Conspiracy requires proof of (1) an agreement with another person to break the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among the alleged conspirators.    United States v. Lopez , 100 F.3d 113, 118 (10th Cir. 1996). "Generally, it is sufficient for purposes of a single-conspiracy finding that a conspirator knowingly participated with a core conspirator in achieving a common objective with knowledge of the larger venture."    Daily , 921 F.2d at 1008.

Quarterman contends that "[t]he evidence, at best, points toward three users and sometime retailers, often acting independently, but occasionally co-operating with one other defendant for the duration of a particular transaction or joint venture."  Quarterman Br. at 17.  Adkins argues that although he may have been present during illegal transactions, "[a]t best, the evidence merely reveals that Corey Adkins was a buyer/user."  Adkins Br. at 14.  Vaziri argues that he distributed drugs independent of his mother and brother, and that to the extent he may have been involved in their dealings, such involvement was merely incidental.

We think that the jury was justified in concluding otherwise.  In the first place, there was considerable evidence of conspiratorial agreement and

-20-

cooperation between Quarterman and Adkins. Quarterman told Agent Peters that Adkins had gone to California to get the methamphetamine she sold to Peters, and estimated that Adkins had obtained a total of five ounces. Quarterman repeatedly answered Agent Peters' queries about obtaining an entire ounce by raising the possibility that Adkins would sell such a quantity. She eventually told Peters that Adkins would sell only grams. Then, circumstantial evidence supports, and indeed appears to compel, the conclusion that Adkins supplied two grams of methamphetamine to Quarterman for resale on March 14, 1997. Quarterman and Adkins also cooperated in their use of the Mill Inn records to expose the undercover operation.

While it would be possible to conclude from the record that Vaziri did some independent drug dealing and that he was involved in the conspiracy to a lesser degree than Adkins and Quarterman, there was sufficient evidence for the jury to conclude that Vaziri did concur in and promote the conspiracy's illegal objectives. Wiberg's testimony tends to show that Quarterman, Adkins, and Vaziri were involved in a joint operation to sell drugs and that they protected each others' interests. And during Addington's March 13, 1997 phone call to Quarterman where Vaziri is heard in the background, even though Vaziri apparently told Quarterman that he didn't know how much methamphetamine Adkins had, the fact that Quarterman asked Vaziri this question permits an

-21-

inference that Quarterman, Adkins, and Vaziri shared information and cooperated in making drugs available. In addition, Vaziri supplied the LSD that Quarterman sold Addington, and Vaziri was present with Quarterman at the site of the transaction. This tends to show that Vaziri "knowingly participated with a core conspirator in achieving a common objective with knowledge of the larger venture." Daily, 921 F.2d at 1008.

In sum, while it is possible to credit appellants' arguments that their drug-selling activities were only loosely integrated, those arguments do not save them where each was aware of and complicit in the larger venture. The evidence was sufficient to show that Quarterman, Adkins, and Vaziri knowingly agreed to cooperate in the distribution of illegal substances.

### 2. Failure to Give a Multiple-Conspiracy Charge

Vaziri and Quarterman contend that the district court erred in not giving a multiple-conspiracy instruction to the jury. No one requested such an instruction at trial, and therefore we must determine only if the court committed plain error in not giving such an instruction sua sponte. See United States v. Jamieson, 806 F.2d 949, 953 (10th Cir. 1986). There was no such error here; the relevant instructions given by the district court, see R. Vol. 25, Tr. at 2014, 2018-19, tracked the instructions approved in United States v. Evans, 970 F.2d 663, 675

(10th Cir. 1992), and adequately conveyed the government's burden of proof, <u>see</u> <u>id.</u>

### 3. Multiple-Object-Conspiracy Issues

Appellants point out that the jury returned general verdicts on Count One of the indictment, which charged a multiple-object conspiracy involving (1) LSD, (2) methamphetamine, (3) cocaine, and (4) marijuana, listed in the conjunctive. Appellants argue that because the government did not prove each of the four objects alleged in the indictment, various errors infected the jury's deliberations and verdicts.

First, appellants allege error in the court's instruction to the jury regarding a multiple-object conspiracy. Over objections by defense counsel, the court instructed the jury "that when an offense is charged in the conjunctive, the offense may be proven in the disjunctive." R. Vol. 25, Tr. at 2020. The court continued:

> Thus, in order for you to find the defendants guilty of Count One of the superseding indictment, you must find beyond a reasonable doubt that at least one of these four purposes were objects of such conspiracy, but you need not find that all of these purposes were objects of such conspiracy. You must, however, unanimously agree on which object or objects of the conspiracy the defendants agreed to violate.

R. Vol. 25, Tr. at 2021.

Appellants argue that both Count One of the indictment and this instruction erroneously aggregated four separate crimes, and that this instruction impermissibly allowed the jury to convict them on theories for which there was not sufficient evidence. These arguments are precluded by Griffin v. United States, 502 U.S. 46 (1991), which upheld a general verdict based on a similar instruction and indictment. The appellant in Griffin was charged with a conspiracy involving two objects, and the district court instructed the jury that it needed to find proof of only one object in order to convict. The Court upheld a general verdict rendered after this instruction, stating that the failure to give an instruction eliminating the unsupported ground was not reversible error. Id. at 56-57, 60. We think the case before us is indistinguishable. See also United States v. Bell, 154 F.3d 1205, 1209 (10th Cir. 1998).

Appellants next argue, without citing legal authority, that the district court erred in refusing to require the jury to arrive at special verdicts, one for each of the four illegal substances in the indictment. Appellants contend further, again without legal support, that the court improperly denied motions for acquittal as to the LSD, cocaine, and marijuana portions of the indictment. Based on our reading of Griffin, we do not think the district court was required to treat each substance separately in ruling on motions for acquittal or in submitting verdict forms to the

-24-

jury.  In <u>Griffin</u> the Court appeared to endorse similar practices, but refused to

require them:

> Indeed, if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration.  The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction.

<u>Griffin</u> , 502 U.S. at 60.


## D.  Sentencing Issues

### 1.  Obstruction of Justice Enhancement

Adkins and Quarterman contend that their sentences were improperly

enhanced for obstruction of justice based on evidence of the phone calls to

Addington during the night of March 14-15, 1997.  The Sentencing Guidelines

provide the following:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

U.S. Sentencing Guidelines Manual § 3C1.1 (1995).     [6]  In our review of obstruction

of justice enhancements, "[w]e give due deference to the district court's

---

[6]The November 1, 1995 Guidelines Manual was used in these cases.  <u>See</u> Quarterman Presentence Report at 12, ¶ 12; Adkins Presentence Report at 10, ¶ 8; Vaziri Presentence Report at 11, ¶ 14.

application of the Guidelines to the facts and its ability to judge the credibility of the witnesses upon whose testimony it relied." United States v. Hankins, 127 F.3d 932, 934 (10th Cir. 1997).

Adkins argues only that the testimony of Addington on which the court relied was hearsay testimony that did not possess sufficient reliability. The Sentencing Guidelines provide that courts "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a) (1995); see United States v. Padilla, 947 F.2d 893, 896 (10th Cir. 1991).

Although as to some matters Addington was evidently not the most credible of witnesses, his testimony regarding the phone calls was substantially corroborated. Quarterman admitted that she made the 2:00 AM phone call, and that she and Adkins had the Mill Inn records at her residence, where they were recovered by law enforcement. Addington's identification of the 11:45 PM caller as Adkins was not directly corroborated. However, the fact that Addington told Agent Williams about the 11:45 call and first tentatively identified Adkins' voice before the 2:00 AM call adds credibility to Addington's more confident identification of Adkins after 2:00 AM. The district court was entitled to credit this testimony.

Quarterman argues that she did not threaten Addington, rather that she called him because she was "worried," "sleepless," and "distraught" over the betrayal of a former lover, hoping that Addington had "an explanation for her fears and concerns." Quarterman Br. at 26. However, the district court found otherwise. It stated:

> I don't think law-abiding citizens call folks at two o'clock in the morning to ask "what's up." For me to accept the defendant's position that that was simply a casual call to find out whether or not she was under investigation stretches credulity.
>
> . . . .
>
> Based upon my recollection of the evidence, that phone call was made by this defendant and her co-conspirators in the early morning hours of March 15th for one purpose: To affect the outcome of this case and attempt to obstruct justice.

R. Vol. 32, Quarterman Sent. Tr. at 80-81. Based on the circumstances surrounding the call, including its timing and content, we find ample support for the court's finding that Quarterman's call to Addington was a threat, and uphold the resulting enhancement of her sentence.

## 2. Weapons Possession Enhancement

Appellants each contend that their sentences were improperly enhanced for possession of firearms based on evidence regarding the .22 rifle and the 9mm rifle. Quarterman contends that the rifles were not connected with the conspiracy,

and that even if they were, she had no knowledge of such a connection. She claims that at most the evidence shows she was storing the guns for her sons: the 9mm because Adkins was a convicted felon, and the .22 because her 9-year-old son Hunter was too young. Adkins argues that the 9mm gun belonged to a friend, and that neither the .22 rifle nor the 9mm rifle were connected with the conspiracy. Vaziri makes similar claims.

The Sentencing Guidelines provide for an offense level enhancement of two points "[i]f a dangerous weapon (including a firearm) was possessed" during a drug conspiracy. USSG § 2D1.1(b)(1) (1995). We review factual findings under USSG § 2D1.1(b)(1) for clear error; we give due deference to the application of the Guidelines to the facts; we review purely legal questions de novo. United States v. Underwood, 982 F.2d 426, 428 (10th Cir. 1992).

We stated the appropriate legal standard in United States v. Smith, 131 F.3d 1392, 1400 (10th Cir. 1997):

"The [enhancement for weapon possession] should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1, comment., (n.3). The government bears the initial burden of proving possession by a preponderance of the evidence, and possession may be satisfied by showing mere proximity to the offense. See United States v. Roberts, 980 F.2d 645, 647 (10th Cir. 1992). The enhancement is then appropriate unless the defendant proves the exception–that it is clearly improbable the weapon was connected with the offense. See id.

-28-

The government meets its initial burden when it shows that a weapon was located near the general location where at least part of a drug transaction occurred.    See United States v. Flores , 149 F.3d 1272, 1280 (10th Cir. 1998);    United States v. Roederer , 11 F.3d 973, 982-83 (10th Cir. 1993). Here, both guns were recovered on March 15, 1997, from Quarterman and Vaziri's residence, where all three appellants had completed drug transactions in the previous two days. In addition, Agent Peters saw the 9mm rifle on Quarterman's dining room table during his March 14 visit to Quarterman's residence, where he completed a drug transaction involving Adkins and Quarterman.

The burden therefore falls on appellants to show that it is "clearly improbable" that either gun was "connected with" the conspiracy. Although Vaziri and Quarterman presented convincing evidence that neither ever used or owned guns, that does not establish a lack of connection with the conspiracy.    See Smith , 131 F.3d at 1400. There was also evidence that Vaziri and/or Quarterman were merely storing the guns for other persons. Even if credited, this evidence is not enough to meet the "clearly improbable" standard, because no one established that coconspirator Adkins had not likely used the guns in connection with the conspiracy. Therefore we uphold the weapons possession enhancements.

### 3. Drug Quantity Calculations

Adkins argues that the district court's drug quantity calculation improperly included amounts which were attributable only to coconspirators. We review a district court's drug quantity calculation for clear error. See United States v. Roberts, 14 F.3d 502, 519 (10th Cir. 1993). Because Adkins was convicted of conspiracy, his sentence is based not only on drug amounts with which he personally dealt, but also any amounts "which he reasonably foresaw or which fell within the scope of his particular agreement with the conspirators." United States v. Ivy, 83 F.3d 1266, 1289 (10th Cir. 1996) (internal quotes and citations omitted); see USSG § 1B1.3(a)(1)(B); United States v. Melton, 131 F.3d 1400, 1403 (10th Cir. 1997).

The district court based Adkins' sentence on a total of 108 grams of methamphetamine. See R. Vol. 28, Adkins Sent. Tr. at 107. This included an estimated 80 grams [7] from Adkins' March 1997 trip to California, and another 28 grams from Quarterman's February 1997 trip. See R. Vol. 28, Adkins Sent. Tr. at 91-93, 107. The evidence showed that Adkins personally handled the 80 grams, and we do not understand him to contest that amount. The 28-gram quantity was properly attributed to him based on the fact that the evidence considered at

_____

[7]There was evidence that Adkins had obtained almost five ounces on this trip, but the government made a more conservative estimate of 80 grams based on Quarterman's admission that Adkins gave her between 40 and 42 grams, an amount she described as half Adkins' total from the March 1997 trip. See R. Vol. 28, Adkins Sent. Tr. at 92.

sentencing showed that he had sent the February 23, 1997 wire transfer of $898 to Quarterman in Bakersfield, California. This wire transfer permitted an inference of conspiratorial agreement as to the one ounce of methamphetamine Quarterman purchased on that trip. There was no clear error on this record.

Based on the foregoing considerations, we AFFIRM appellants' convictions and sentences.