**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 5 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | No. 03-2137 and 03-2144 |
| v. | (D. New Mexico) |
| JESUS FALLS and BERNARDO RODRIGUEZ, | (D.C. No. CR-01-1616-JP) |
| Defendants-Appellants. | |

**ORDER AND JUDGMENT** *

Before **MURPHY** , **HOLLOWAY** , and **McCONNELL** , Circuit Judges.

Co-defendants Jesus Falls and Bernardo Rodriguez appeal their convictions

for distribution of 50 grams or more of a substance containing cocaine base and

for conspiracy to commit that offense. Mr. Rodriguez also challenges the

enhancement of his sentence for possessing a dangerous weapon during a drug

trafficking offense. We **AFFIRM** both defendants' convictions and Mr.

Rodriguez's sentence.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## BACKGROUND

On October 30, 2001, Oscar Chacon got a phone call. The caller asked whether Mr. Chacon could sell him nine ounces of crack. Mr. Chacon responded that he could obtain that amount and would sell it for $5,000. Unfortunately for Mr. Chacon, the caller was Arturo Gamboa, an undercover detective with the Albuquerque Police Department.

Detective Gamboa called back later that day to confirm the terms of the deal. Mr. Chacon assured him that the deal was still on. Mr. Chacon then told the detective to come to Mr. Chacon's house to make the exchange.

Detective Gamboa drove to Mr. Chacon's house in Albuquerque. He arrived after dark. A van containing a surveillance team of Albuquerque police officers was parked out of sight nearby. The officers planned to execute a "buy-bust" operation, meaning that they would immediately arrest the drug dealers when they gave the drugs to the undercover officer. The surveillance team in the van could hear Detective Gamboa's words through a hidden transmitter, although their understanding of Spanish was limited.

Mr. Chacon met Detective Gamboa outside his house. He told the detective that he had to go inside to make a phone call. Mr. Chacon came back outside a few minutes later and said, "Okay, I made a phone call; it should be here shortly." Rodriguez App. 68.

-2-

The two men waited outside for about twenty minutes. Mr. Chacon then asked to use Detective Gamboa's cell phone. Mr. Chacon dialed a number, and Detective Gamboa heard him say, "Okay, you're almost here, where are you at? We're waiting, I'm getting impatient here." *Id*. at 68-69. Mr. Chacon hung up, and said to the detective, "Okay, it will be here in a little bit." *Id*. at 69.

About five or ten minutes later, a green Ford Explorer pulled up to the house. Mr. Chacon said, "Okay, it's here." *Id*. Detective Gamboa and Mr. Chacon approached the passenger side of the Explorer. Defendant Jesus Falls was driving, and Defendant Bernardo Rodriguez was the passenger. Mr. Chacon pointed to Detective Gamboa and said to the defendants, "he's the guy with the money." *Id*. at 70.

Detective Gamboa then introduced himself to the defendants. Both Mr. Falls and Mr. Rodriguez immediately explained that they did not have the whole nine ounces, but they had seven. The detective asked for a price quote on the seven ounces. Mr. Rodriguez offered $600 per ounce. Detective Gamboa countered with $4,000 for all seven. Mr. Falls rejected that offer, but offered to get two more ounces for Detective Gamboa and give him a more favorable price on those two. Detective Gamboa agreed.

Mr. Falls then said to Mr. Rodriguez, "Well, show it to him, give it to him, let him see it." *Id*. at 72-73. Mr. Rodriguez pulled a bag of crack cocaine out

from underneath his sweater and handed it to the undercover detective. Detective Gamboa then gave the "arrest signal" to the surveillance team in the van. *Id*. at 73.

As the van approached, the drug dealers appeared to Detective Gamboa to get nervous. Mr. Rodriguez reached under the back of his shirt. Detective Gamboa was concerned that he might be reaching for a gun. The detective asked Mr. Chacon whether he knew who was in the van, in the hope that Mr. Chacon would agree that he was familiar with the van and reassure Mr. Rodriguez. Mr. Chacon looked at the van and said, "Oh, yeah, I know them, they're my friends." *Id*. at 75. This caused Mr. Rodriguez to relax.

The doors of the van flew open, and police officers burst out shouting "police!" in English and Spanish. Detective Gamboa saw Mr. Rodriguez reach under his shirt again, and the detective walked away with the crack and the money. The surveillance officers arrested Mr. Chacon, Mr. Falls, and Mr. Rodriguez. The officers handcuffed the three men and laid them out face down on the ground. Mr. Rodriguez began squirming around, trying to stand up. The officers told him to stay still. Mr. Rodriguez complained that his arms were hurting and that he needed to stand up. He asked the officers to take off the handcuffs. The officers then rolled him over in order to help him up to a sitting position. Upon doing so, the officers immediately spotted a gun on the ground

-4-

directly underneath where Mr. Rodriguez's stomach had been. The gun was a loaded .38 caliber revolver. One of the officers said, "Oh, that's why you wanted me to take off your handcuffs." *Id.* at 123. Mr. Rodriguez responded, "[T]hat's not mine." *Id.* Another officer later found .38 caliber ammunition in the Ford Explorer.

On December 13, 2001, a federal grand jury indicted Messrs. Chacon, Falls, and Rodriguez on one count of conspiracy to distribute 50 grams or more of a substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846; and one count of distribution of 50 grams or more of a substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A). The grand jury also charged Mr. Rodriguez with one count of carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A).

Mr. Chacon absconded before trial. The trial of the two remaining defendants began on December 11, 2002. Detective Gamboa was the first witness for the United States. Defense counsel objected to Detective Gamboa's testimony regarding his conversations with Mr. Chacon about the crack deal on the ground that testimony about Mr. Chacon's statements was inadmissible hearsay. The government responded that the statements were admissible as statements of a co-

conspirator in furtherance of the conspiracy. The district court agreed with the government and admitted the testimony.

Later in the trial, the prosecutor asked a DEA agent how he came to be involved in the case. The agent responded that the Albuquerque police contacted him after the arrest because they "knew that I was currently conducting an investigation involving both Mr. Bernardo Rodriguez and Jesus Falls." *Id*. at 198. Defense counsel objected that this was improper testimony that the defendants were suspected of other, uncharged crimes, and he demanded a mistrial on that basis. The government responded that the evidence was proper because it was offered to rebut an assertion that defense counsel had made during opening argument that the case had been transferred to the DEA because of the Albuquerque Police Department's bias. The district judge asked defense counsel what he meant by his reference to "bias." Defense counsel responded that the transfer to the DEA "shows a bias of APD" because "when you have Cubans and you have guns and you have crack cocaine, those cases always come to DEA." *Id*. at 203. The trial judge denied the motion for a mistrial, saying that he did not think the testimony "had a significant impact on the jury in terms of the government's obligation to prove guilt in this case." *Id*. at 205. The district judge also determined that the evidence would be "fairly responsive" to defense counsel's argument about bias if the defense continued to advance it. *Id*. at 207.

The judge therefore instructed the prosecutor not to solicit additional testimony about an ongoing investigation and not to refer to it in arguments to the jury, unless defense counsel persisted in alleging bias. The prosecutor complied with this instruction, and defense counsel did not subsequently pursue his bias argument.

At the close of the government's case, both defendants moved for a judgment of acquittal on the conspiracy count. The trial judge denied the motion and submitted the case to the jury. During deliberations, the jury sent a note to the judge which inquired about the status and whereabouts of Mr. Chacon. The trial judge decided to give the following written response, over the objection of defense counsel: "You must decide the case on the basis of the evidence admitted for your consideration during the trial and you must follow all of the court's instructions as a whole, including instruction 15." *Id.* at 410. Instruction 15 stated, "The defendants are not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case." *Id.* at 335.

The jury convicted both defendants of distribution of cocaine base and of conspiracy. The jury found Mr. Rodriguez not guilty of the firearm charge.

At sentencing, Mr. Rodriguez objected to the presentence report's recommendation that he receive a two-level sentencing enhancement for possessing a dangerous weapon during the commission of a drug offense. *See* U.S.S.G. § 2D1.1(b)(1). The district court denied the objection and found that Mr. Rodriguez possessed a weapon during the commission of the offense. After applying the enhancement, the court determined that Mr. Rodriguez's adjusted offense level was 36, resulting in a sentencing range of 188 to 235 months. The district court imposed a sentence of 188 months.

DISCUSSION

I.

The defendants argue that the district court erred in allowing Detective Gamboa to testify about the content of Mr. Chacon's out-of-court statements. The district court admitted the testimony about the statements on the ground that they were statements of a co-conspirator. We review the district court's decision to admit statements of a co-conspirator for abuse of discretion. *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999).

The Federal Rules of Evidence provide that a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Co-conspirator statements may properly be admitted if the court finds that (1) a conspiracy existed; (2) both the

declarant and the defendant against whom the declaration is offered were members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy. *Eads*, 191 F.3d at 1210. The party offering the evidence must prove these facts by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987). Such evidence may include the statements themselves, but the statements alone are not sufficient to establish that a conspiracy existed and that the declarant and the defendants were members of it. Fed. R. Evid. 801(d)(2)(E).

The defendants contend that the only evidence supporting the district court's finding that Mr. Chacon was their co-conspirator was the statements themselves. It is true that the district court relied in part on the content of the statements in making its findings. However, reliance on the out-of-court statements is permissible as long as there is also independent evidence of conspiracy. *See Bourjaily*, 483 U.S. at 181; *United States v. Hernandez*, 829 F.2d 988, 993-94 (10th Cir. 1987); Fed. R. Evid. 801(d)(2)(E). In this case, the independent evidence is substantial. The fact that the defendants showed up at Mr. Chacon's house with crack for sale within ten minutes of Mr. Chacon's making a phone call is highly probative of the defendants' involvement with Mr. Chacon in a drug distribution conspiracy. In addition, the defendants immediately told Detective Gamboa that they did not have "the nine ounces," which shows that

they had received information, presumably from Mr. Chacon, about how much crack the detective wanted to buy. This independent evidence, when combined with the statements themselves, is more than sufficient to support the district court's finding.

The defendants also claim that Mr. Chacon's statements were not in furtherance of the conspiracy. This is a difficult argument to make, because all of Mr. Chacon's statements either directed someone to come to his house to deliver crack or reassured Detective Gamboa, the prospective buyer, that Mr. Chacon had crack for sale that would arrive at his house. Thus, the statements were plainly intended to facilitate the conspirators' distribution of crack cocaine. The defendants' argument for why the statements were not in furtherance of the conspiracy is that the statements were made to a government agent. The defendants cite several cases from other circuits for the proposition that the "in furtherance" requirement cannot be met by statements to government agents. *See, e.g.*, *United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983); *United States v. Miller*, 664 F.2d 94, 98-99 (5th Cir. 1981). The cases cited by the defendants do not even suggest such a principle. The relevant inquiry is not who the conspirator was speaking to but what purpose he intended the statements to serve. *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993). If the speaker intended to promote the conspiracy's objectives by making the statement, the statement is "in

-10-

furtherance" of the conspiracy. *Id*. A statement, like a confession, whose sole purpose is to disclose information to the government might not be in furtherance of a conspiracy, but statements that are obviously intended to facilitate a drug transaction do not cease to be "in furtherance" of a drug distribution conspiracy merely because the conspirator was speaking to an officer of the government. The statements were therefore admissible as statements of a co-conspirator in furtherance of the conspiracy.

## II.

The defendants contend that the district court erroneously denied their motion for judgment of acquittal because there was insufficient evidence of conspiracy. To review the denial of a motion for acquittal, we review the record *de novo*, in the light most favorable to the government, to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Wood*, 207 F.3d 1222, 1227-28 (10th Cir. 2000).

A conspiracy conviction requires proof of (1) an agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among the alleged conspirators. *United States v. Vaziri*, 164 F.3d 556, 565 (10th Cir. 1999). Because "[s]ecrecy and concealment are essential features of successful conspiracy," *Blumenthal v. United States*, 332 U.S. 539,

557 (1947), direct evidence of conspiracy is often hard to come by. Therefore, conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action. *United States v. Hardwell*, 80 F.3d 1471, 1482 (10th Cir. 1996).

The defendants contend that the government's evidence showed at most only a buyer-seller relationship between themselves and Mr. Chacon, and that this is insufficient to establish the elements of conspiracy. But there was no evidence that the defendants wanted to sell the crack to Mr. Chacon and there was considerable, albeit circumstantial, evidence of mutual coordination between them and Mr. Chacon from which the jury could reasonably have inferred a conspiratorial agreement to distribute drugs. Mr. Chacon made a phone call and then told Detective Gamboa that the nine ounces of crack would soon arrive. Minutes later, the defendants drove up. Upon seeing them, Mr. Chacon told Detective Gamboa that the drugs had arrived. Mr. Chacon then pointed to the detective and explained to the defendants that he was the one with the money. Both defendants immediately explained that they didn't have "the nine ounces." After price negotiations, they then distributed seven ounces of crack to Detective Gamboa.

The defendants argue that their showing up at the opportune moment with crack to sell was just an unfortunate coincidence. *See* Rodriguez Br. 20 ("Rodriguez arrived at Chacon's residence spontaneously and not at the urging of a phone call from Chacon."). Perhaps so, but in light of all the circumstantial evidence of coordination, the jury was certainly not required to believe the defendants' improbable coincidence story. The evidence was more than sufficient to support the defendants' conspiracy convictions, and the district court did not err in denying their motion for judgment of acquittal.

III.

The defendants contend that the district court should have granted their motion for a mistrial after a DEA agent testified that the reason why the Albuquerque Police brought the agent into the case was because they knew that he had been conducting an investigation involving Mr. Falls and Mr. Rodriguez. We review a district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Kravchuk*, 335 F.3d 1147, 1154-55 (10th Cir. 1994).

The defendants argue that the DEA agent's testimony that he had been conducting an investigation involving Mr. Falls and Mr. Rodriguez was inadmissible under Federal Rule of Evidence 404(b). That rule prohibits the admission of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid.

-13-

404(b). Alternatively, the defendants insist that the evidence should have been suppressed under Federal Rule of Evidence 403, because its probative value was substantially outweighed by its prejudicial effect on the jury.

The government responds that Rule 404(b) is inapplicable because the evidence was not offered as evidence of a prior crime to show action in conformity therewith. Rather, the evidence was offered to rebut an assertion that defense counsel made during opening argument about the Albuquerque Police Department's bias in transferring the case to the DEA. The government contends that the evidence was also admissible under Rule 403 because a defendant who raises a subject in an opening statement "opens the door" to admission of evidence on that same subject by the government. *See United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000).

We do not think the district court's resolution of this question was an abuse of discretion. The district judge seemed to acknowledge that defense counsel had "opened the door." It would have been within his discretion to admit the evidence on that basis. *Id*. Nevertheless, he also seems to have concluded that both the defense's bias argument and the prosecution's evidence about an ongoing DEA investigation were of dubious value to the jury in determining whether the defendants were guilty of the crimes charged. He therefore instructed the prosecution not to elicit any further testimony about the investigation and not to

refer to it during arguments unless the defense persisted in its bias argument. Both parties prudently complied, and nothing more was said about the DEA investigation or Albuquerque Police Department bias for the remainder of the trial. In this context, it was well within the district judge's discretion to conclude that a single isolated statement by a DEA agent that he had been investigating the defendants prior to their arrest did not have a sufficiently prejudicial effect on the jury to warrant a mistrial. *See United States v. Behrens*, 689 F.2d 154, 162 (10th Cir. 1982) ("Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury.") (internal citations and quotation marks omitted).

## IV.

The defendants' next argument is that the district court's response to the jury's question about the whereabouts of Mr. Chacon was improper and misleading, and therefore requires reversal of their convictions. While we review the jury instructions as a whole to determine whether they correctly state the governing law and provide an ample understanding of the issues, the submission of supplemental jury instructions after the jury has retired is a matter committed to the trial court's discretion. *United States v. Arias-Santos*, 39 F.3d 1070, 1075-76 (10th Cir. 1994).

The district judge may respond to a jury's question by referring to a specific jury instruction if the instruction is a correct statement of the law and is responsive to the question. *See id*. at 1076. The district judge's response to the jury's question about the status of Mr. Chacon was that the jury should follow all of the court's instructions, including Instruction 15. That instruction stated, "The defendants are not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case." Rodriguez App. 335. There is nothing legally incorrect about this instruction. It is also responsive to the jury's inquiry, as it instructs them to concern themselves only with determining the guilt or innocence of the defendants as to the crimes charged rather than speculating about the current whereabouts of Mr. Chacon.

The defendants claim that emphasizing Instruction 15 in this context suggested to the jury that it could find the defendants guilty of conspiracy based only on their own unilateral actions. This is not a plausible inference from the judge's response, particularly in light of the other jury instructions that correctly set forth the elements of conspiracy. Therefore, the judge's reference to Instruction 15 was proper; the instruction was legally correct, helpful to the jury, and not materially misleading.

V.

The defendants claim that the district court erred when it failed to instruct the jury that the specific type of cocaine base was an element of the offense. The defendants contend that the term "cocaine base" as used in the jury instructions was too broad, because there are certain forms of cocaine base that differ chemically from "crack cocaine" and the defendants were convicted under a statutory provision that applies only to crack. The defendants did not raise this objection at trial, and we therefore review their claim for plain error. *United States v. Lujan*, 268 F.3d 965, 967 (10th Cir. 2001).

The defendants' claim seems to be that the jury instructions should have said "crack" instead of "cocaine base." It is hard to see why this should be so when the instructions' use of the term "cocaine base" mirrors the language of the indictment and the relevant statute. The indictment alleged that the defendants distributed 50 grams or more of a substance containing "cocaine base" in violation of 21 U.S.C. § 841(b)(1)(A). Rodriguez App. 19. That statute prohibits and provides a maximum sentence of life imprisonment for distribution of 50 grams or more of a substance containing "cocaine base." 21 U.S.C. § 841(b)(1)(A). The jury instructions in turn required that the jury find beyond a reasonable doubt that the defendants distributed and conspired to distribute 50 grams or more of "cocaine base." Rodriguez App. 324. The jury instructions'

reference to "cocaine base" is therefore correct on its face, because this is the term used in the indictment and the statute.

Nevertheless, the defendants contend that the instructions must refer specifically to "crack," because the term "cocaine base" in § 841(b)(1)(A) is limited to crack and the jury might have understood the term as used in the instruction to refer to types of cocaine base that are not crack. We find this argument unpersuasive. Even if the defendants' interpretation of "cocaine base" as it appears in § 841(b)(1)(A) is correct, the fact remains that the jury instructions used the same term that appears in the statute. There is no need for the instructions to further limit the statutory term "cocaine base" to "crack" unless there is some risk that the jury might have found that the defendants were distributing some form of cocaine base that was not crack. However, in this case, there was no evidence that the substance that the defendants distributed was anything but crack. Detective Gamboa and Mr. Chacon referred repeatedly to "crack" in their negotiations; it was clear that they were negotiating a deal for crack, not some other form of cocaine base. In addition, the government offered unrebutted testimony of a DEA forensic chemist who stated that he performed laboratory tests on the drugs recovered from the scene and concluded that "it was cocaine base, commonly referred to as crack cocaine." Rodriguez App. 230. In

this context, it was not plain error for the district judge to fail to instruct the jury that "cocaine base" means only "crack."

VI.

Mr. Rodriguez alone appeals the enhancement of his sentence under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon during a drug trafficking offense. We review the district court's legal interpretation of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Vaziri*, 164 F.3d 556, 567 (10th Cir. 1999).

Section 2D1.1(b)(1) provides: "If a dangerous weapon was possessed (including a firearm), increase by 2 levels." The application notes explain that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.3. The government bears the initial burden of proving possession by a preponderance of the evidence, and may do so by showing mere proximity to the offense. *United States v. Smith*, 131 F.3d 1392, 1400 (10th Cir. 1997). Once the government meets this burden, the enhancement applies unless the defendant proves that it is clearly improbable that the weapon was connected with the offense. *Id*.

Mr. Rodriguez argues that there was insufficient evidence to support the district court's finding that he possessed the gun. However, the district court's

-19-

finding was well supported by record evidence. Detective Gamboa testified that he twice saw Mr. Rodriguez reach under his shirt when the situation appeared dangerous. The officers found the gun on the driveway directly underneath where Mr. Rodriguez's waistband had been just seconds before. They also found ammunition matching the caliber of the gun in the Ford Explorer. Given this evidence, the district court's finding was not clearly erroneous.

Mr. Rodriguez also argues that the enhancement cannot be applied to him because the jury acquitted him of the charge under 18 U.S.C. § 924(c) of carrying a firearm during and in relation to a drug trafficking offense. This argument is foreclosed by our decision in *United States v. Morehead*, 959 F.2d 1489 (10th Cir. 1992). In *Morehead*, we upheld the application of the enhancement for possessing a dangerous weapon despite the defendant's acquittal on a 924(c) charge because "the standard to convict on § 924(c) 'is much higher than that necessary for an enhancement under the Guidelines.'" *Id*. at 1512 (quoting *United States v. Goddard*, 929 F.2d 546, 549 (10th Cir. 1991)).

*Morehead* is therefore precisely on point and mandates our rejection of Mr. Rodriguez's argument. In response, Mr. Rodriguez submits that *Morehead* was wrongly decided and invites us to revisit it, on the ground that it is manifestly unconstitutional for a defendant's sentence to be enhanced on the basis of conduct for which the jury has acquitted him. Even if it were permissible for this panel to

overrule the decision of a previous panel, Mr. Rodriguez's argument would fail because the constitutional principle he relies on has been squarely rejected by the Supreme Court. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (holding, in a case where a defendant was acquitted on a 924(c) charge but given an enhancement for weapon possession, that a sentencing court may consider conduct of which a defendant has been acquitted).

## VII.

For the foregoing reasons, we **AFFIRM** both defendants' convictions and Mr. Rodriguez's sentence.

Entered for the Court

Michael W. McConnell
Circuit Judge

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 13 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JESUS FALLS,

Defendants-Appellants.

No. 03-2137

District of New Mexico

(D.C. No. CR-01-1616-JP)

**ORDER** *

Before **MURPHY** , **HOLLOWAY** , and **McCONNELL** , Circuit Judges.

This matter comes before the Court on the motion by Jesus Falls to recall

the mandate in his case, No. 03-2137, which was entered on March 29, 2004. *See*

*United States v. Jesus Falls and Bernardo Rodriguez*, 2004 WL 407039 (10th

Cir., Mar. 5, 2004) (unpublished).  Mr. Falls argues that the Supreme Court's

decisions in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), and *United States v.*

*Booker*, 125 S. Ct. 738 (2005), "demonstrate that he was correct in his sentencing

argument raised on direct appeal and that this court erred in denying relief on that

---

*This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.

argument." Appellant's Mot., at 3. Be that as it may, the decision in this case was final when the judgment was affirmed and the time for seeking certiorari passed. *See Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied."). The proper means for challenging confinement pursuant to an allegedly unconstitutional sentence is not a motion to recall the mandate, but a habeas corpus proceeding under 28 U.S.C. § 2255.

Nothing in the statutes or rules governing the proceedings of the Courts of Appeals authorizes those courts to recall their mandates, but the Supreme Court has held they have such "inherent" authority. *Calderon v. Thompson*, 523 U.S. 538, 549 (1998). The Court has cautioned, however, that "the power can be exercised only in extraordinary circumstances." *Id.* at 550. "The sparing use of the power demonstrates it is one of last resort, to be held in reserve against grave, unforeseen, contingencies." *Id.*

Mr. Falls points to prior decisions of this Court recalling the mandate, but those decisions are easily distinguishable. In *Gomez v. New Mexico*, 937 F.2d 616 (10th Cir. 1991) (table), 1991 WL 132445, this Court issued its mandate on June 27, 1991, remanding to the district court for further proceedings. On June 24, 1991, however, the United States Supreme Court handed down a decision

inconsistent with this Court's ruling, and indicated that the decision should be applied retroactively. The appellee filed a motion to recall the mandate "several days later," on July 3, 1991. The court granted that motion, explaining that "[t]o hold otherwise would be to engage in an exercise in futility, requiring the district court to apply a legal analysis which has now been repudiated by the Supreme Court." *Id.* at 1. This case is different in three ways: (1) the supervening Supreme Court decision(s) came down after the mandate had issued; (2) the lapse of time between the mandate and the motion to recall in this case is almost a year, as opposed to "several days"; and (3) this case would not entail a district court proceeding pursuant to an erroneous legal analysis. The other cases cited by Mr. Falls are even farther afield.

It may be unfortunate, but it is not "grave," "unforeseen," or "extraordinary," that the Supreme Court renders decisions that are inconsistent with prior final decisions of the lower courts. The proper avenue for reconsideration, in cases involving continuing confinement, is via habeas. Whether relief is available via habeas depends, in part, on whether the Supreme Court's supervening rulings are intended to apply retroactively. We have no occasion to decide, in this case, whether collateral relief is available on a *Booker* claim. In *United States v. Price*, — F.3d —, 2005 WL 535361, (10th Cir., Mar. 8, 2005), at 5, this Court has held that *"Blakely* does not apply retroactively to

-3-

convictions that were already final at the time the Court decided *Blakely*, June 24, 2004."

The motion to recall this court's March 29, 2004 mandate is **DENIED.**

Entered for the Court,

PATRICK FISHER, Clerk